UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| ALLESSANDRA BROHMER, et al., | 1:02-CV-5649 OWW DLB |
|---|---|
| Plaintiffs, | ORDER GRANTING IN PART AND DENYING IN PART UNITED STATES' MOTION FOR SUMMARY JUDGMENT (DOC. 73/78) |
| v. | |
| UNITED STATES OF AMERICA, | |
| Defendants. | |

## I. <u>INTRODUCTION</u>

This is a wrongful death suit brought against the United States under the Federal Tort Claims Act by the next of kin of Judson Brohmer, a civilian aerial photographer who died when an Air Force fighter jet on which he was aboard crashed near the China Lake Naval Weapons Station. The United States moves for summary judgment on one issue, which may be dispositive of the entire case: whether at the time of the accident Mr. Brohmer was a "special employee" of the Air Force under California's worker's compensation law? (Doc. 79.) If Brohmer was a "special employee," his sole remedy lies in the worker's compensation system.

The United States filed its motion along with a statement of undisputed material facts on August 2, 2005. (Doc. 75-1.) On November 7, 2005, Plaintiff filed opposition, along with a two hundred and twenty-seven page response to Defendant's statement

**1**

of undisputed material fact (Doc. 86), a separate statement of
disputed facts (Doc. 87), and a motion to strike certain portions
of the United States' summary judgment brief which rely upon
unpublished caselaw.  (Doc. 88.)  Oral argument originally set
for December 12, 2005, but was continued several times.  On April
4, 2006, Plaintiffs filed a supplemental opposition addressing
the issue of securing workers' compensation.  (Doc. 141.)  The
United States replied, and did not object to consideration of the
supplemental filing.  (Doc. 143.)[1]

## II.  <u>FACTUAL BACKGROUND</u>

On July 17, 2001, a United States Air Force F-16B[2] crashed
on the China Lake Naval Weapons Station, located in eastern
California.  The crash occurred while the F-16B was participating
in the observation of an experimental piece of military equipment
-- a Miniature Air Launched Decoy (MALD) launched from another F-
16B.  (USA's Stmt. of Undis. Fact ("USASUF") #1; USA Ex. A, USAF
Mishap Report.)  Major Aaron George, an Air Force experimental
test pilot, and Judson Brohmer, a civilian aerial photographer,
occupied the aircraft involved in the accident.  Both were killed
in the crash.  (USASUF #3; USA Ex. A.)

---

[1]     In its reply, the United States also raised numerous
objections to evidence presented by Plaintiffs.  (Doc. 143.)
Plaintiffs responded to these evidentiary objections in a
separate document. (Doc. 147.)

[2]     The F-16B is a two-seat, single-engine fighter
aircraft.  (USASUF #2; USA Ex. C, Walker Decl. at ¶10.)

**2**

## A. **Background on the MALD Mission and Lockheed's Contractual Relationship with the Air Force**.

The Air Force contracted with Northrup Grummond to develop the MALD for the suppression of enemy air defenses.[3]  Test flights for the MALD were conducted by the 416th Flight Test Squadron (the "Squadron"), which is part of the 412th Flight Test Wing, which in turn is part of the Air Force Flight Test Center, located at Edwards Air Force Base ("Edwards AFB").  The Squadron was responsible for organizing F-16 test aircraft, chase aircraft, project pilot support, and aerial photography support for the MALD flight tests at Edwards AFB.  (USASUF #19; USA Ex. E, 412 TW/DR Memo, July 2, 2001.)

Two aircraft participated in each test flight.  One aircraft released the MALD, the other was the "photo/safety chase aircraft."  A photo/safety chase aircraft is present to (1) visually track the MALD to ensure that it does not become a hazard to others; and (2) videotape the MALD during the flight test.  The Air Force maintains that during the July 17, 2001 mission, the first purpose (safety) was the primary role of the photo/safety aircraft.  (USASUF #20; USA Ex. DD, Less Depo. at 212-13; Ex RR, Thornton Depo. 607-609, 672.)

Flight test operations at the 416th Flight Test Squadron, including the  MALD flight tests, were supported by personnel from Lockheed Martin under a requirements contract for

---

[3]    The MALD mimics the radar signature of the F-16 aircraft to "confuse and mislead" enemy air defenses.  The MALD is approximately 91 inches long and 6 inches wide.  It has retractable wings and a small jet engine.  (Ex. D, Preliminary Investigation Report For the MALD Developmental Test 24 on 17 July 2001, RAC 371-SE-0767.)

1    engineering and technical support services ("the Contract").

2    (USASUF #22; USA Ex. F, Contract No. F42620-97-D-0010.)  Pursuant

3    to the contract, the Air Force issued delivery orders to Lockheed

4    Martin ("Lockheed") for specific test support services.  On July

5    17, 2001, the date of the mishap, Lockheed was providing

6    engineering and test support services to the Air Force under

7    Delivery Order Number 0407.  (USASUF #23; USA Ex. I, Delivery

8    Order 407.)  The Statement of Work for that delivery order began

9    with a brief description of the Combined Test Forces concept:

10           The F-16 flight test program was established and
             continues to function within the framework of a
11           combined USAF/contractor test force operating out of
             Edwards AFB to accomplish the [Developmental Test &
12           Evaluation] requirements of the F-16 program.

13   (USASUF #25; USA Ex. I, Delivery Order 407, Statement of Work at

14   ¶2.1.1.)  The Statement of Work called for Lockheed to provide

15   photographic support when requested by the Air Force (Statement

16   of Work at ¶3.2.14.), and further stated that Lockheed Martin

17   personnel "may participate in test missions as crewmembers,

18   subject to the approval of 416 FLTS/DO."  (USASUF #25; Statement

19   of Work at ¶2.2.12 (emphasis added).)

20        The Delivery Order was paid on a cost-plus-fixed-fee basis,

21   pursuant to which the Air Force reimbursed Lockheed Martin for

22   its reasonable, allocable, and allowable costs of contract

23   performance plus a fixed fee.  (USASUF #26; Federal Acquisition

24   Regulation Part 31.204 (48 C.F.R. § 31.204); USA Ex. I, Delivery

25   Order No. 0407.)

26   //

27   //

28   //

**4**

**B.   Aerial Photography as a Regular Part of Air Force Operations**.

Colonel Walker, who is responsible for the operations of all aircraft at Edwards AFB (USASUF #49; USA Ex. TT, Walker Dep. at 16-18), testified that that photo/safety chase missions are an integral part of Air Force flight tests.  Walker explained, for example, that the Air Force Test Pilot School provides photo/safety chase instruction as a regular part of its curriculum and that numerous Air Force publications address the subject of photo safety chase missions.  (USASUF #50; USA Ex. C, Walker Decl. at ¶9.)  Chief Test Pilot Paul Metz also testified that photo documentation of flight tests was a regular part of the business of the Flight Test Center at Edwards AFB.  (USASUF #51; USA Ex. OO, Metz Dep. at 170.)  Aerial photographers participated in 23 of the 24 developmental MALD flight tests at Edwards AFB.  (USASUF #52; USA Ex. JJ, Corrected List of MALD Missions.)

Plaintiffs do not dispute these assertions, but point out that the Air Force did not have any photographers who did aerial photography or video work at Edwards Air Force Base who were employees of the government.  (Walker Depo. at 318:9-25; 358:18-360:6; Shakelford Depo. at 272:25-273:10).  The United States does not dispute the absence of Air Force photographers at Edwards AFB, but does present evidence that the Air Force employs military aerial photographers at another Air Force Base.  (*See* Doc. 143, Reply, at 25; USA Ex. YY.)

**5**

1    **C.   <u>Brohmer's Prior Employment With Lockheed Martin</u>**.

2    From November 20, 1997 until February 28, 2001, Judson

3    Brohmer was employed full-time by Lockheed Martin as an in-flight

4    aerial photographer/videographer.  (USASUF #5; USA Ex. J, Brown

5    Decl. at ¶11; USA Ex. R, Flight Evaluation Folder; USA Ex. S,

6    Training Folder; USASUF #7; USA Ex. NN, Davis Depo. at 56.)

7    While a full-time employee of Lockheed, Mr. Brohmer was

8    permanently assigned to Edwards AFB, primarily with the F-22

9    Combined Test Force.  (USASUF #4; USA Ex. Z, Bromsey Depo. at 66-

10   67.)  During this period, Mr. Brohmer participated in flight

11   tests at Edwards Air Force Base, including three MALD flight

12   tests on January 28, 1999, November 4, 1999, and October 25,

13   2000.  (USASUF #6; USA Ex. MM, Ward Depo. at 666-67; USA Ex. JJ,

14   Listing of Prior MALD Missions.)

15   **D.   <u>Mr. Brohmer's Relationship with In the Light and
         Lockheed at the Time of the Accident</u>**.

16
17   Mr. Brohmer left his salaried position with Lockheed at the

18   end of February 2001.  (USASUF #9; USA Ex. NN, Davis Depo. at 54.

19   A. Brohmer Decl. at ¶3-4; Shakelford Depo. at 157:6-158:18; Davis

20   Depo. at 138:20-23; Metz Depo. at 91:2-92:18; 93:4-14.)  On

21   February 6, 2001 Mr. Brohmer signed an "independent contractor"

22   agreement with "In the Light, Inc," a Texas based company.

23   (Pltfs' Ex. 1; Kamper Depo. at 94:18-23; 237:15-238:7).  In the

24   Light specializes in brokering the services of photographers and

25   media production specialists.  (USASUF #9; USA Ex. X, Kamper

26   Depo. at 91-93.)  While working under his agreement with In the

27   Light, Judson Brohmer was free to accept photographic assignments

28   at his choosing.  (A. Brohmer Decl. at ¶4; Ward Depo. at 44:7-

**6**

16).

In the Light entered into a contract with Lockheed to provide video and photographic services, pursuant to which In the Light provided the services of Mr. Brohmer to Lockheed. (Kamper Depo. at 86:2-15; 90:21-94:17). Under this contract, In the Light billed Lockheed for photographic services provided by Mr. Brohmer, when requested by Lockheed and agreed to by Brohmer. (*Id.* at 90:4-94:17). Gail Kamper, administrative business manager of In the Light, considered Brohmer to be an "independent contractor," not an employee of In the Light. (*Id.* at 15:17-19; 177:25-179:10.)

Brohmer sent bills for the photographic work he did for Lockeed to In the Light and received payment from In the Light. However, In the Light, did not withhold taxes or social security from Brohmer's payments, and did not provide any benefits to Brohmer. In the Light billed Lockheed for the charges submitted by Brohmer plus a 15% surcharge for In the Light's billing services.  In the Light received payment directly from Lockheed. (*Id.* at 169:13-171:10; 251:7-21; Pltfs' Ex. 3, invoices; Pltfs' Ex. 4, Jan. 31, 2001 letter; A. Brohmer Decl. at ¶6.)  In the Light billed Lockheed Martin $600 per day when Mr. Brohmer performed aerial work and $400 per day when he worked from the ground.  (USASUF #14; Ex. X, Kamper Depo. at 169, 216.)

The photo job assignments Brohmer accepted through In the Light were irregular and lasted only a few days at a time. (Pltfs' Ex. 3, In the Light Invoices; A. Brohmer Decl. at ¶7-8.) In the Light had no control over Mr. Brohmer's work or the rates he charged.  Nor did In the Light train him, secure work

**7**

assignments for him, provide him with equipment, or instruct him how to perform his work.  (Kamper Depo. at 82.)

The United States points to the testimony of Scott Davis, Chief of the Multimedia Department of Lockheed Martin Aeronautics, who stated that Lockheed's intent was for Brohmer's job status to remain the same, except that a different entity would be paying him.  (USASUF #11; USA Ex. NN, Davis Depo at 84.)  Plaintiff, however, points to contrary testimony from Air Force personnel.  For example, Colonel Mark Ward, who at the time of the accident was the Operations Officer for the 416th Flight Test Squadron, understood that Brohmer was an independent contractor performing work for Lockheed and that this arrangement "would give him more flexibility in his career...."  (Ward Depo. at 44:7-16.)

**E.   Evidence Re: Whether Brohmer was Considered "Crewmember" of the F-16B by the Air Force.**

The United States places great emphasis on evidence suggesting that Mr. Brohmer was considered a "crewmember" by the Air Force both during his time as a salaried Lockheed employee and at the time of the accident.  Plaintiffs' dispute both the factual accuracy and the legal significance of any such designation.[4]

---

[4]   For example, Plaintiffs argue that, as a general rule, visiting dignitaries on an F-16 are labeled "crew members," but are not considered general or special employees of the government.  (Walker Depo. at 342:21-345:13.)  Whether any such designation as a "crewmember" is legally significant is directly addressed in the discussion section.  Plaintiffs' factual submissions to the contrary are presented in the factual

**8**

### 1.   Evidence Re: Whether Aerial Photographers are Considered "Crewmembers."

Kevin Robertson, a Lockheed Martin senior aerial photographer, testified that, during a photo/safety chase mission, an aerial photographer functions as both a photographer and a crewmember, and that aerial photographers are expected to be crewmembers first and photographers second. (USASUF #54; Ex. PP, Robertson Depo. at 316.)  For example, during one of the two MALD missions in which Mr. Robertson participated as an aerial photographer, the MALD fell "rapidly out of sky."  Robertson stopped filming because the MALD was "too far away" and  because he wanted "to give the pilot another set of eyes to look for it." He stressed that, "It was all that we can do to try to keep it in sight, and to try to track it with the video camera makes it twice as hard."  (USASUF #55-56; USA Ex. PP, Robertson Depo. at 391-93.)

Tom Reynolds, another Lockheed Martin photographer who has flown on numerous MALD and other flight tests at Edwards Air Force Base, testified that Lockheed Martin hires photographers and the Air Force trains them to be "crewmembers." (USASUF #59; USA Ex. Y, Reynolds Depo. at 27-29.)  Reynolds explained that he received cockpit/crew resource management  (CRM) training from the Air Force and additional training regarding his duties as a "crewmember." (*Id.* at 88-115.)

Plaintiff points out, however, that Reynolds was never told he was and never considered himself to be a government employee when

background section.

1  filming and photographing the MALD from a F-16 plane.  (*Id*. at
2  47:9-10; 294:15-295:10; 326:20-327:2.)

3      Reynolds testified that an aerial photographer is
4  responsible for ensuring his equipment does not interfere with
5  the aircraft's flight controls, assisting with air space
6  management, watching for other aircraft and the terrain, and
7  generally functioning  as a back up to the pilot.  For example,
8  the photographer will make the pilot aware of caution and
9  malfunction lights that may be illuminated.  The photographer
10 carries an emergency checklist to aid the pilot during an
11 emergency.  If the pilot becomes incapacitated during the flight,
12 the photographer is instructed to take control of the aircraft.
13 (USASUF #60; Ex. Y, Reynolds Depo. at 88-93.)  According to
14 Reynolds, "You're not a vegetable back there.  You're
15 participating in what's going on." (USASUF #61; Ex. Y, Reynolds
16 Depo. at 91.)

17     However, according to Reynolds, the real reason a
18 photographer would be on the aircraft is to document the flight
19 test activity.  (*Id*. at 202:8-14.)  Filming the MALD required a
20 high degree of skill and concentration by the photographer to
21 keep the MALD in sight and to hold the camera still.  (*Id*. 292:5-
22 25.)  More specifically, Reynolds testified that when filming the
23 MALD, the aerial photographer needs to use judgment and skill to
24 successfully capture the necessary film recordings.  (*Id*. at
25 102:8-12; 103:2-23; 196:8-197:2; 329:4-13).

26     Other photographers reiterated the notion that the
27 photographer is not "a sandbag in the back."  According to Bobbie
28 Garcia, the photographer is "an active team member."  (USASUF

**10**

#70; USA Ex. UU, Garcia Depo. at 578.)  Both the pilot and the photographer are "supposed to be paying attention to certain things like altitude, and what's going on outside the jet, looking for traffic, [listening to the radio communications] and trying to avoid any mishap." (*Id*. at 345-46.)  Specifically, she recalled that photographers are told in CRM class that, "you are an active crewmember." (USASUF #71; USA Ex. UU, Garcia Depo. at 355.)

Similarly, Scott Davis, the chief of the multimedia department of Lockheed Martin (USASUF #72; USA Ex. NN, Davis Depo. at 15), testified that Mr. Brohmer was being paid not only to take pictures, but to do whatever the military required of him under the contract that Lockheed Martin had with the government. (*Id*. at 154; *see also* USA Ex. PP, Robertson Depo. at 334; USA Ex. UU, Garcia Depo. at 577 (we're "being paid to do more than just take pictures.").)  Davis testified, however, that Brohmer's primary job while on the F-16 was to do aerial photography work. (Davis Depo. at 155:25 - 156:15.)

Colonel Thornton testified that Mr. Brohmer was recognized as a "crewmember" by Air Force instruction 11-202 and other Air Force Regulations.  Air Force Instruction 11-202 FT, Volume 3, 3.13.4.1, states that "chase air crew must be aware of test point requirements and assist the test pilot by continually monitoring his parameters and be responsible for aircraft separation." (USASUF #65; Ex. RR, Thornton Depo. at 610-12.)  According to Thornton, Brohmer was part of the chase air crew described in that regulation. (*Id*. at 612-13.)  Section 3.13.4.5 of Air Force Instruction 11-202, called Photo Chase, states that chase

**11**

1  aircraft will fly safety chase during times when photo chase is
2  not required.  According to Thornton, Mr. Brohmer was a part of
3  both the photo and safety chase and his duties were not limited
4  to just photography.  (USASUF #66; USA Ex. RR, Thornton Depo. at
5  613-14.)  Moreover, Thornton maintains that the pilot and
6  photographer share responsibilities to ensure that the chances of
7  an accident are minimized.  (USASUF #67; Thornton Depo. at 618-
8  619.)

9       Colonel Thornton further testified that the pilot is the
10 ultimate authority with respect to positioning the aircraft, and
11 can direct the photographer to put the camera down or take other
12 action.  (USASUF #69; Ex. RR, Thornton Depo. at 124-25.)
13 Paintiffs do not dispute the general proposition that anyone who
14 rides on any plane is under the absolute authority of the pilot
15 during flight, irrespective of employment.

16      However, numerous other witnesses confirmed that nonpilot
17 aerial photographers are not backup pilots and do not have the
18 training or expertise to fly.[5]  In addition, Air Force pilots
19 relied on the expertise of the aerial photographer to determine
20 photographic procedures.  For example, on a previous MALD test
21 flight, Air Force Pilot Major Buckely "left it up to [Brohmer's]
22 expertise."  (Buckley Depo. at 143:16 - 144:25)

23

24

25      [5]    In support of this factual assertion, Plaintiffs
   initially cited several declarations that have been challenged by
26 the Defendant as not being based on personal knowledge.  *See*
   infra at Part IV.A. (Evidentiary objections).  However, even
27 government witnesses appear to concede that no aerial
   photographer has the training to operate a fighter jet.  (*See*
28 *e.g.*, Stinar Depo. at 327:19-330:8.)

1   Plaintiffs also point to general testimony that suggests it
2   would be impossible for a photographer to maintain situational
3   awareness while performing photographic duties, in part because
4   photography diverts ones attention from the broader environment
5   around you. (*See* Robertson at 119:6-120:3, Arno Decl. at ¶3G.)

6

7         **2.   Specific evidence That Brohmer Acknowledged His**
               **Status as a "Crewmember" During His Time as a**
8               **Salaried Lockheed Employee.**

9   The United States points to some evidence suggesting that
10  Mr. Brohmer acknowledged and accepted his status as a crewmember.
11  For example, during his time as a salaried Lockheed employee, on
12  August 9, 2000, Mr. Brohmer signed a Salaried Appraisal Form
13  (covering the period from July 1, 1999 to June 30, 2000), stating
14  that his job responsibilities "include but are not limited to
15  support F-22 CTF flight test activities at Edwards Air Force
16  Base, California, video/film cameras, still camera equipment,
17  location lighting and audio, photo flight chase.  Flight
18  crewmember."  (USASUF #9; USA Ex. HH, Salaried Appraisal Form.)

19  Mr. Brohmer was considered useful by the Air Force as a
20  "crewmember" because of his prior participation in MALD missions.
21  (USASUF #121; USA Ex. CC, Buckley Decl. at ¶1.)  Major Buckley,
22  the pilot on one MALD mission, had no such experience and relied
23  on Mr. Brohmer's experience and ability to monitor how far they
24  were away from the MALD to aid in the maneuvering of the
25  aircraft. (USASUF #123 & 126; USA Ex. WW, Buckley Depo. at 162-
26  63.)

27  Plaintiffs note, however, that Major Buckley specifically
28  testified that he relied on Brohmer's expertise as an *aerial*

**13**

*photographer* in operating the camera and Brohmer's expertise as to the best position to be in for the purpose of obtaining photography.  (Buckley Depo. at 143:16-145:25.)

### 3.  Specific Evidence that Brohmer Was a Considered a "Crewmember" at the Time of the Accident.

The United States also asserts that the Air Force considered Brohmer to be a "crewmember" on the F-16b at the time of the accident.  For example, at the time of the accident, Lockheed Martin had expressly represented to the Air Force that Mr. Brohmer was an "aircrew member" who would be supporting flight test operations.  Lockheed also represented that Mr. Brohmer "had current flight orders."  (USASUF #15; USA Ex. EE, Request for Approval of Contractor Flight Crewmember.)  Chief Test Pilot Metz stated that the fact that Mr. Brohmer was no longer "in the direct employment of Lockheed Martin had no effect on his duties as an air crew member."  (USASUF #12; Ex. OO, Metz Depo. at 61.)  In addition, Kevin Robertson, an aerial photographer employed by Lockheed Martin, testified that "[n]othing changed, he held the same badges, same access within the compound."  (USASUF #13; Ex. PP, Robertson Depo. at 274.)  "We worked together for three years side by side.  He knew the ins and outs of the program.  I didn't have to do anything  to change what he was hired to come in and do....It was pretty much transparent."  (*Id.* at 276)

Before participating in test missions aboard military aircraft, aerial photographers must first obtain flight authorization from the Air Force.  The Air Force documented flight authorizations for contractor personnel using Form 81,

**14**

*Flight Authorization For Crewmember/Operational Support Flyer (Civilian)*.  (USASUF #77; USA Ex. J7, Form 81.)  The Form 81 that applied to Mr. Brohmer at the time of the mishap was dated September 7, 2000.  (USASUF #78; USA Ex. J, Brown Decl. at ¶9; USA Ex. J7, Form 81.)  The operative Form 81 stated that, "[t]he performance of crewmember/operational support duties is essential to the mission and is required to fulfill official job responsibilities."  (USASUF #79; USA Ex. J7, Form 81.)  It further stated

      a.   Your status aboard the aircraft is that of crewmember/operational support flyer rather than a passenger.

      b.   The aircraft missions on which you participate as a crewmember/ operational support flyer may involve flight testing or flight of a special high risk nature on which passengers would normally be excluded.

      c.   Your personal insurance policies may be jeopardized by your presence aboard in a crewmember/operational support status without special aviation riders.

(USASUF #80; Ex. J7, Form 81.)[6]

The United States also points out that the Government Flight Representative approved Mr. Brohmer's "flight orders" granting him permission "to perform flight duties" on board the Air Force aircraft, based on Lockheed's representation that Brohmer would be an "aircrew member," and after checking Brohmer's "qualifications and currencies."  (USASUF #16; Ex. GG, Leskowsky Decl. at ¶7.)  Being on "flight orders" means that a person has

_____

[6]     Although it is disputed whether Brohmer received a copy of the most recent Form 81, Kevin Robertson testified that he handed the Form 81 for September 1998 to September 1999 to Mr. Brohmer.  (Ex. PP, Robertson Depo. at 213.)

1  been "approved for ongoing flight activities as an aircrew member
2  in  an Air Force aircraft."  (USASUF #17; Ex. QQ, Craig Depo. at
3  214-16.)[7]

4      Presumably as further evidence that Mr. Brohmer's understood
5  his role as a "crewmember" at the time of the accident, the
6  United States presents evidence of a conversation between Mr.
7  Brohmer and Lt. Col. Craig's office just prior to the accident
8  flight.  Mr. Brohmer expressed concern about flying with the
9  pilot assigned to the flight, Major George, because George had
10 not previously flown a MALD mission.  (USASUF #138; USA Ex. QQ,
11 Craig Depo. at 135-40.)  During this conversation, Brohmer
12 apparently made reference to the concept of "situational
13 awareness."  (Ex. QQ, Craig Depo. at 156-57.)

14     Plaintiff, however, points out that the flight authorization
15 (Form 81) operating at the time of the accident justified
16 Brohmer's presence onboard Air Force aircraft "to provide
17 video/photo coverage of F-22A Test, Photo/Safety Chase and Target
18 Mission."  There is no mention on the form that Brohmer would
19 assume other types of duties.  (USA Ex. J-7 & R).

20

21     **F.   Evidence That Contractor Personnel Were Treated Like
            Air Force Personnel**.

22

23 The United States also maintains that contractor personnel,

24 including Mr. Brohmer, were required to follow the same Air Force

25 rules and regulations governing flight operations as their

26

27     [7]   Plaintiff also maintains that his designation as a
28 crewmember is irrelevant to a determination of Brohmer's legal
   status at the time of the accident.

**16**

1  military counterparts.  (USASUF #30-32; USA Ex. C, Walker Decl.

2  at ¶3.)   For example, contract personnel were required to comply

3  with Air Force crew rest restrictions by obtaining eight hours of

4  uninterrupted rest during the 12-hour period before the beginning

5  of a flight duty period.   They also could not fly within 12 hours

6  after consuming alcoholic beverages, and within 24 hours of scuba

7  diving.  (Air Force Joint Instruction 11-202, Volume 3, §§ 9.4.5,

8  9.9.3.1, 9.9.3.4; USA Ex. FF, Thornton Decl. at ¶4.)

9       Lockheed Martin and the Air Force entered into a Memorandum

10  of Agreement ("MOA").   (USA Ex. G3, MOA 97-07-03.)   Among other

11  things, Lockheed and the Air Force agreed that the Air Force

12  would "fly Lockheed personnel in the same manner that it flies

13  military personnel." (Ex. G3, MOA 97-07-03; Ex. RR, Thornton Dep.

14  at 615.)[8]  Commander of the 416th Flight Test Squadron and F-16

15  Combined Test Force, Colonel William Thornton, testified that it

16  was his understanding that Lockheed Martin personnel were to be

17

18       [8]     In the MOA, Lockheed Martin and the Air Force agreed to
    the following:

19

20       [Lockheed Martin] aircrew and non-aircrew participating in
         CTF flight operations at Edwards AFB do so at the discretion

21       of the Director of Flight Operations (DFO) with contractual
         oversight provided by the [Air Force] Government Flight

22       Representative.

23       The [Air Force] intends to fly [Lockheed Martin] air crew
         and non-aircrew, in as many ways as practical, as it flies

24       its military force.

25       [Lockheed Martin] aircrew are expected to conform to

26       prevailing military directives.  [Air Force] agrees to
         provide sorties and ground training to standardize its

27       contractor force with respect to these changes.

28  (USASUF #35; USA Ex. G3, MOA 97-07-03.)

**17**

1  treated as if they were in the military and that it was the

2  intent of the government and Lockheed for them to be so treated.

3  (USASUF #34; USA Ex. RR, Thornton Depo. at 614.)

4      Major Lenny Leskowsky, the government flight representative

5  at the time of the accident, signed the MOA on behalf of the Air

6  Force.  (USASUF #36; USA Ex. G3, MOA 97-07-03.)  In addition, he

7  signed the monthly Request for Approval of Contractor Flight

8  Crewmembers presented to him by Lockheed Martin's Chief Pilot

9  Paul Metz.  (USASUF #36; USA Ex. EE, Request for Approval of

10 Contractor Flight Crewmember.)  Major Leskowsky's primary job was

11 to "ensure that contractor flyers were current and qualified to

12 perform flying duties in accordance with established procedure

13 and within the scope of any and all contractual agreements

14 between the applicable contractor and the U.S. Government."

15 According to Major Leskowsky's understanding Mr. Brohmer was to

16 be treated as if he were an active duty Air Force photographer

17 and crewmember even though he was a civilian.  (USASUF #37; Ex.

18 GG, Leskowsky Decl. at ¶6.)  Lieutenant Colonel Don Edwards,

19 another government flight representative, testified that, "[i]n

20 this particular situation, it was deemed that, since you have

21 contractors flying with military operations so closely, that you

22 want to mirror image, as much as possible the same requirements."

23 (USASUF #38; USA Ex. G, Edwards Depo. at 185-90.)

24     Colonel Thornton stated that he "integrated" aerial

25 photographers into other aspects of flying, including aircrew

26 meetings.  (USASUF #39; USA Ex. RR, Thornton Decl. at ¶7.)

27 //

28 //

**18**

> Photographers were also considered part of the
> squadron.  They were invited to all social functions –
> and frequently attended as well.  As a commander, I
> believed that social functions were important in
> gaining the mutual trust and respect between aircrew
> members that literally depend on each other for their
> lives in the air.

(USASUF #40; USA Ex. RR at ¶7.)

### G.   Training Given to Brohmer and other Aerial Photographers.

Mr. Brohmer was required to meet the proficiency, currency, and medical standards established by the Air Force.  (USASUF #82; USA Ex. L, Cole Decl. at ¶4; USA Ex. J, Brown Decl. at ¶3.)  The applicable training requirements included, among other things: altitude chamber; aircraft egress; life support equipment training; fire extinguisher; hanging harness training; local area survival training; land survival; and water survival.  (USASUF #84; USA Ex. L, Cole Decl. at ¶4.)

One of the courses Mr. Brohmer was required to complete was cockpit/crew resource management" (CRM) training.  The person responsible for providing this training to Mr. Brohmer and others at Edwards AFB was Air Force Master Sergeant Todd Cole.  (USASUF #85; USA Ex. L, Cole Decl. at ¶6.)

On December 18, 2000, Master Sergeant Cole provided refresher crew resource management training to Mr. Brohmer.  The course lasted about three hours.  (USASUF #86)[9]   The purpose of

_____

[9]    Plaintiff objects to this fact on the ground that it is not supported by any citation to the evidence and moves to strike it from the record.  In an otherwise meticulously cited statement of facts, the United States appears to have inadvertently omitted the record reference for this single fact (#86).  The reference, however can be easily located by examining the Declaration of

1  the CRM training was to provide crewmembers and test personnel

2  with performance-enhancing knowledge and skills to carry out

3  their respective tasks in the performance of an Air Force

4  mission.  CRM is the effective use of all available resources –

5  people, weapon systems, facilities, equipment, and environment –

6  by individuals, teams, or crews to safely and efficiently

7  accomplish an assigned mission or task.  (USASUF #87; Cole Decl.

8  at ¶7-8.)

9       During the CRM training, Cole stressed to Mr. Brohmer and

10  the others in the class that they were responsible for "actively

11  participating" in the flight as a part of the crew and that each

12  crewmember has a duty to maintain situational awareness by

13  monitoring themselves, the aircraft, and the surrounding

14  environment and to communicate information clearly with one

15  another.  Mr. Brohmer was instructed to be assertive if he

16  believed something was wrong.  (USASUF #89; Cole Decl. at ¶9.)

17  Cole also discussed in class a concept known as "passenger

18  syndrome"  referring to a situation where a crewmember becomes

19  complacent because he assumes the other member of the crew has

20  the situation under control.  In class, Cole cautioned the

21  students, including Mr. Brohmer, to be aware of and avoid

22  passenger syndrome.  They were expected to act and think like

23  crewmembers.  (USASUF #90; Cole Decl. at ¶10.)

24

25

26  Master Sergeant Cole, which is referenced in the surrounding
    facts.  The correct reference should be to the Cole Declaration

27  at paragraph 6.  Because the omission appears to have been
    inadvertent and is easily corrected, the motion to strike is

28  **DENIED.**

1    Mr. Brohmer was also required to take and pass written

2 examinations and weekly tests for each of the aircraft in which

3 he flew, mostly focused on emergency procedures for the aircraft.

4 The Air Force further required Brohmer to review all open Flight

5 Crew Information Files (FCIF) before flying.  The FCIF is a

6 collection of publications and materials related to daily flight

7 operations, such as safety of flight information.  (USASUF #91;

8 USA Ex. J, Brown Decl. at ¶¶ 7-8.) Finally, the Air Force

9 required Mr. Brohmer to have a current FAA flight physical.

10 (USASUF #92; USA Ex. O, AFJI 10-220, Volume 1 ¶¶ 3-7.)

11    To qualify to work aboard the F-16 aircraft, Mr. Brohmer was

12 required to complete F-16 ground and flight qualification

13 training with Air Force Major Bruce Stinar on January 6, 1998.

14 (USASUF #93; USA Ex. N, Stinar Decl. at ¶3.) The F-16 training

15 began in the classroom, where Major Stinar discussed all of the

16 F-16 aircraft systems and the cockpit set-up.  He used diagrams

17 and photos to discuss, among other things, the function and

18 operation of the flight instruments in the aircraft, the various

19 switches, the front and backseat cockpit, ejection seat, canopy,

20 communications and navigation equipment, warning lights,

21 throttle, flight controls, etc.  (USASUF #94; USA Ex. N, Stinar

22 Decl. at ¶4.)

23    After the classroom instruction, Major Stinar and Brohmer

24 spent time in an F-16 aircraft, where Major Stinar again

25 discussed the aircraft systems and cockpit set-up, including the

26 function and operation of the various flight instruments

27 discussed in the classroom.  Major Stinar confirmed that Brohmer

28 understood and was able to properly set up the backseat for the

**21**

flight and use the necessary equipment.  (USASUF #97; Ex. N, Stinar Decl. at ¶6.)

Next, Stinar led Brohmer through a flight training session, to evaluate whether Brohmer understood and could perform proficiently a required set of training events.  The training flight took about 1.3 hours to complete.  Major Stinar recalled that Brohmer had an excellent comprehension of the aircraft systems and was proficient in all training subjects, including emergency procedures and situational awareness.  (USASUF #97; USA Ex. N, Stinar Decl. at ¶7.)  During the flight training, Major Stinar stressed to Brohmer that he was part of the crew and was expected to be an active participant in the flight.  Stinar advised Brohmer that his duties went beyond simply photographing the intended target.  (USASUF #98; USA Ex. N, Stinar Decl. at ¶8.)  For example, Stinar explained that during a photo/safety chase mission, Brohmer and the pilot must communicate constantly about positioning the chase aircraft to permit Brohmer to photograph the intended target.  (USASUF #99; USA Ex. N, Stinar Decl. at ¶8.)  Major Stinar also trained Mr. Brohmer to serve as a second set of eyes, assisting in airspace management, and generally identifying anything that looked "dumb, unsafe, or different."  (USASUF #100. Ex. N, Stinar Decl. at ¶8.)

Major Stinar flew with Mr. Brohmer on several occasions in addition to the qualification flight on January 6, 1998.  On some of those flights, while not actually performing a test mission, Major Stinar transferred control of the aircraft to Mr. Brohmer. Mr. Brohmer understood the aircraft systems, including the flight

**22**

1 instrumentation, and he was very good with the flight controls.

2 (USASUF 101; Ex. N, Stinar Decl. at ¶9.)

3     William Craig, the F-22 operations officer for the 411th

4 Flight Test Squadron at Edwards AFB from June 1999 to November

5 2001, testified that crew members were required to attend

6 quarterly safety meetings.  Passengers who were not crewmembers

7 would not have to attend such meetings.  Mr. Brohmer, along with

8 every other photographer that flew in the backseat of an F-16B or

9 F-15, was obligated to attend.  (USASUF ##103-104; USA Ex. QQ,

10 Craig Depo. at 112-13.)

11     The Air Force required Mr. Brohmer to maintain his flight

12 currency.  The currency requirement was one mission per 60 days.

13 (USASUF #106; USA Ex. PP, Robertson Dep. at 206.)  The Air Force

14 tracked Mr. Brohmer's proficiency, currency, and medical

15 qualifications using the Air Force Operations Research Management

16 System (AFORMS), a computer-based management system.  The 411th

17 Flight Test Squadron maintained Brohmer's record in AFORMS, along

18 with the records of all other military and contractor personnel

19 who were on flying status.  (USASUF #108; USA Ex. J, Brown Decl.

20 at ¶4.)[10]  Brohmer's training and flight records reflect that he

21 complied with Air Force requirements for crewmembers/operational

22 support flyers.  The Individual Training Summary generated by

23 AFORMS on July 17, 2001, indicates he had completed and was

24 current in all applicable training requirements listed in the

25

26     [10]  Plaintiff notes that Air Force Regulations require that

27 such records be maintained for non-crewmembers as well as
crewmembers.  (USA Ex. G, AFJI 10-220, ¶4-4,)

28

**23**

1  412th Operation Group Training Guide, except for C-135 aircraft
2  egress training.  (USASUF #111; USA Ex. J1, Training Summary.)

3       Plaintiffs point out, however, that the training and medical
4  standards applicable to Mr. Brohmer are substantially similar to
5  what is required for any person including visiting dignitaries
6  scheduled to ride in an Air Force aircraft on only one occasion.
7  (Walker Depo. at 342:21-344:10; 349:22-350:15; Cole Depo. at
8  290:1 -291:10; 145:25-146:25.)  For example, Stinar gave
9  incentive rides lasting more than an hour to civilians and
10 visiting dignitaries, who were allowed to handle stick and
11 throttle and perform various maneuvers.  (Stinar Depo. at 52:20 -
12 57:2.)

13      Moreover, Plaintiffs assert that the United States
14 exaggerates the depth of the training actually received by
15 Brohmer.  Bruce Stinar spent only a few minutes discussing
16 emergency procedures, aircraft operation limitation, flight
17 characteristics and prohibited maneuvers, and other special
18 procedures.  (*Id*. at 298:2-16.)  Stinar did not have Brohmer
19 perform unusual attitude recovery, did not demonstrate dive
20 recovery to Brohmer, and did not have Brohmer perform take off or
21 landing.  (*Id.* at 318:4-22; 339:4-7.)

22      With respect to the CRM training given by Cole, Plaintiffs
23 point out that Cole did not teach Brohmer how to read the flight
24 instruments, and is not even qualified to teach about
25 instruments. (Cole Depo. at 96:9-97:23, 100:18-101:10).[11]

26

27      [11]   Plaintiffs also assert that the training received by
   Brohmer was similar to that given to any person who obtains
28 permission to fly aboard an Air Force fighter jet, regardless of

**24**

**H.   General Evidence that Lockheed Aerial Photographers and Pilots Did Not Consider themselves to be Employees of the Government**.

Plaintiff points to testimony from numerous Lockheed employees, who either piloted Air Force aircraft or participated as onboard aerial photographers, who never considered themselves to be employees of the government.  For example, Tom Reynolds, who has been a salaried aerial and flight test photographer with Lockheed Martin since January 5, 1983 and who participated in several MALD test flights, was never told and never considered himself to be government employee when filming and photographing the MALD.  (Reynolds Depo. at 30:11-12, 31:6-8; 47:9-10; 189:3-14); 294:15-295:10; 326:20-327:2.)  Kevin Robertson, another aerial photographer employed by Lockheed who photographed several MALD flights considered himself to be an employee of Lockheed and never considered himself an employee of the government.  (Robertson Depo. at 20:1-22:20; 36:19-22; 83:13-21; 102:3-14).  Finally, Paul Metz, a Lockheed employee who actually flew Air Force planes, and was subject to the Air Force's rules and regulations in that regard, never considered himself and was never told he was an employee of the government.  (Metz Depo. at

---

their employment status.  However, in support of this assertion, Plaintiffs present declarations that have been challenged by the United States as not being supported by personal knowledge.  For example, Plaintiffs presented the Declaration of Paul Smith, who initially stated that the training Mr. Brohmer received was the same type of training received by any passenger or visiting dignitary.  (Smith Depo. at ¶14.)  But, during a later deposition, Smith effectively retracted this assertion after being presented with further details about the training Mr. Brohmer actually received.  (*See id*. at 120-21, 141, 157-58, 177.)

93:15-94:24).  Finally, Bromsey, Lockheed's MALD test flight
program director, never heard Brohmer or any other Lockheed
photographer being referred to as an employee of the United
States for any MALD missions.  (Bromsey Depo. at 50:10-22;
233:20-25-235:3)


I.   **Evidence Re: Control Over Brohmer's Work**.

  1.   **The Air Force's Purported Control Over
       Scheduling of "Backseat" Personnel.**

     The United States asserts that it was "responsible for and
had the authority to schedule any available military and/or
contractor crewmembers for flight test missions."  The chief
scheduler for the 416th Flight Test Squadron was Ms. Virginia
Bradley, a government civil service employee.  (USASUF #115; USA
Ex. P, Bradley Decl. at ¶3; USA Ex. RR, Thornton Decl. at ¶3.)
When there was a requirement for a "backseater," she selected the
individual for the flight and placed him on the flight schedule.
(USASUF #116; USA Ex. P, Bradley Decl. at ¶3.)

     The procedures for scheduling military and Lockheed Martin
personnel were the same.  Ms. Bradley was not required to seek
permission from Lockheed Martin before scheduling their personnel
for a flight.  In addition, only she or the flight commanders
could schedule individuals for flights.  (USASUF #117; USA Ex. P,
Bradley Decl. at ¶3.)  According to Colonel Thornton, the Air
Force, not Lockheed Martin, ultimately decided who would
participate in any given mission, although the Air Force could
entertain a request by Lockheed that a particular employee be
selected.  (USASUF #114; USA Ex. RR, Thornton Depo. at 77-79).

26

1   Nevertheless, Lockheed maintained the right in the first

2   instance to determine whether or not Brohmer would be offered the

3   opportunity to work on a particular mission.  (Davis Depo. at

4   136:1-24; 140:1-18.)  For example, Andrew Bromsey, a Lockheed

5   employee and project manager and test conductor for the MALD

6   program, selected Judson Brohmer to be photographer on the

7   accident flight because of the unavailability of any other

8   Lockheed photographers.  (Bromsey Depo. at 18:12-19; 22:23-23:10

9   60:15-62:16).

10  Brohmer was free to accept photographic assignments at his

11  choosing, and the United States did not exercise any control over

12  which assignments Brohmer accepted and which ones he declined.

13  (A. Brohmer Decl. at ¶4; Ward Depo. at 44:7-16.)  At the time of

14  this accident Brohmer was also performing work for other

15  companies.  The United States had no right to control Brohmer's

16  acceptance of assignments from others, even if they conflicted

17  with assignments In the Light or Lockheed might offer to Brohmer.

18  (Walker Depo. at 321:3-8; A. Brohmer Decl. at ¶4.) There was no

19  contractual relationship or privity between the United States and

20  In the Light.  (Shakelford Depo. at 164:22-166:24.)

21

22              **2.      Control Vested in the Air Force By Virtue of**
                **the Air Force's "Assumption of Risk."**
23

24  In the MOA, the Air Force agreed to assume liability for

25  third-party damages (such as to the aircraft, property damage, or

26  personal  injuries or death of third persons), so long as

27  Lockheed Martin crewmembers had been approved in writing by the

28  Government Flight Representative and had agreed to abide by Air

**27**

Force control.  (USASUF #41; USA Ex. G3, MOA 97-07-03; Ex. F,

Contract; USA Ex. G, Edwards Depo. at 100; USA Ex. GG, Leskowsky

Decl. at ¶¶ 2-6.)  The Agreement stated:

> The [Air Force] assumes the risk for its aircraft
> through the [Air Force] Form 81 and [Air Force] Form
> 5416.  Once [contractor] aircrew are flying on a fully
> coordinated and approved Form 81 or Form 5416, the
> assumption of risk applies throughout the term of the
> approval period.

(USASUF #42; USA Ex. G3, MOA 97-07-03 at 4.)  At the time of the

accident, Mr. Brohmer was flying under an approved Form 81.

(USASUF #43; USA Ex. J7, Form 81.)

Paul Metz, the chief test pilot for the F-22 program at the

time of the accident (USA Ex. OO, Metz Depo. at 6-7), testified

that in return for the assumption of risk, the government

retained the right to control the activities of crew members

assigned to F-15 and F-16 aircraft, including the right to

control what an aerial photographer can do on a flight.  (USASUF

#44; USA Ex. OO, Metz Depo. at 77, 85-86; USA Ex. EE, Request for

Approval of Contractor Flight Crewmember.)

Lockheed Martin certified Mr. Brohmer was "approved under

the terms of the contract and approved by the [Air Force Flight

Test Center] with current flight orders."  (USASUF #45; USA Ex.

EE, Request for Approval of Contractor Flight Crewmember.)   The

Air Force's Government Flight Representative, Leonard Leskowsky,

verified the certification, stating:

> The crew members approval to fly [Air Force] aircraft
> is documented on the Memorandum of Agreement....The
> [Director of Flight Operations] approves flights and
> assumes the risk for contractor personnel in government
> aircraft.   These crew members are administratively
> approved to perform flight duties in aircraft
> supporting the F-22 CTF and are subject to any
> restriction noted.

(*Id.*)

28

### 3.      Equipment being used by Brohmer on the date of the Accident.

There is no dispute that the Air Force supplied the photo/safety chase aircraft and that the Air Force stored, maintained, and inspected all life support and safety equipment used by Mr. Brohmer during the flight.  (USASUF #132; USA Ex. W, Life Support Records; USA Ex. Y, Reynolds Depo. at 116.)

In addition, at least some of the photographic equipment used by Mr. Brohmer during the flight test was supplied by the Air Force.  Tom Reynolds issued an Air Force video camera to Mr. Brohmer to use during the mission.  (USASUF #131l USA Ex. Y, Reynolds Depo. at 106.)  Two other still cameras on the plane were owned by Judson Brohmer.  (A. Brohmer Decl at ¶11; USASUF #134; Ex. RR, Thornton Depo. at 607-09, 672; Ex. II, Flight Test Card.)  However, the United States maintains that his mission was to take underline video.  (*Id.*)

Mr. Brohmer was issued one flight suit by Lockheed and one by the government.  (USASUF #133; USA Ex. PP, Robertson Depo. at 254.)  At the time of the accident, however, Brohmer was wearing the flight suit which he obtained while working for Lockheed. (A. Brohmer Decl. at ¶12).  Generally, Brohmer would wear the flight suit provided by Lockheed with a Lockheed name tag. (Zapka Depo. at 326:3-328:13).

Brohmer used black felt (which Brohmer owned) to reduce glare and reflection in the cockpit.  (Robertson Depo. at 75:18-77:15; 79:21-80:22-82:23; 145:21-24.)

1

**4.     Control over Photographic Work.**

2      It is undisputed that any photographs or video shot on the

3  base are government property.  (USASUF #135; Ex. XX, Zapka Depo.

4  at 96.)  Once the footage has "been released," Lockheed is

5  permitted to "utilize that footage".[12]  (Davis Depo. at 22:14 -

6  23:2.)

7      The Air Force asserts that Brohmer did not have ultimate

8  control over the methods of Brohmer's photographic work.  For

9  example, Colonel Thornton testified that the test conductor would

10 sometimes instruct the photographer to use specific settings,

11 while project engineers might tell photographers what film speed

12 to use or whether to take still or video photographs.  Any

13 disagreement would be decided by the engineer.  (USASUF #63; USA

14 Ex. RR, Thornton Depo. at 189-91.)  Specifically, on a

15 photo/safety chase mission, the Air Force could dictate the photo

16 conditions, such as what filters, lenses, and cameras to use and

17 when to zoom in or out, "in the context of general control  of

18 aircraft where the government takes [i.e. assumes] responsibility

19 [for loss]."  (USASUF 74; USA Ex. OO, Metz Depo. at 164-65.)

20 Moreover, Thornton maintains that Brohmer's choice of equipment

21 had to be pre-approved for flight by the Air Force.  (USASUF #64;

22 USA Ex. RR, Thornton Depo. at 293.)

23

24 ────────────────

       [12]     Once, during the time that Brohmer was a salaried
25 Lockheed employee, the Air Force disciplined Brohmer for
   photographing an F-16 in a "pure vertical climb in full
26 afterburner  with a sunset in the background."  Taking this
   photograph violated Air Force regulations.  Consequently, Mr.
27 Brohmer was banned from making any personal use of  this photo.
   (USASUF #136; USA Ex. QQ, Craig Depo. at 263-266.)

28

1    Plaintiffs point to a set of contrary evidence.  First, it
2  was Northrup Grummond, the contractor manufacturing the MALD, not
3  the Air Force, that defined the photographic requirements for the
4  flight.  (Shakelford Depo. at 354:16-355:2; 367:20-368:13.)
5  Moroever, the photographer would only receive instructions on
6  MALD missions on what type of photo format (still/video) from
7  Lockheed program managers, not the Air Force.

8    Second, other photographers testified that the aerial
9  photographer uses his or her judgment and skill to determine when
10  filming should start and end,  when to zoom in or out, and when
11  to utilize other specific techniques.  (Reynolds Depo. at 102:8-
12  12; 103:2-23; 196:8-197:2;329:4-13; Robertson Depo. at 64:16-
13  69:15; 114:13-115:9; Arno Decl. at ¶10.)

14    Moreover, Plaintiff points out that the Air Force provided
15  no training on how the aerial photographers should perform their
16  photographic duties.  (Cole Depo. at 177:24-178:13; Stinar Depo.
17  at 289:16-290:12.)   There was no discussion at MALD briefings
18  regarding how the aerial photographer should perform his or her
19  photographic duties.  (Bromsey Depo. at 72:19-73:15.)

20    Finally, the photographer chose the type of camera to be
21  used and how it should be used.  (Reynolds Depo. at 101:20-102:3;
22  299:1-12; Bromsey Depo. at 201:20-202:2.)   One test pilot
23  specifically testified that he deferred to the photographer on
24  these issues.  (See Buckley Depo. at 143-144 (he "left it up to
25  [Brohmer's] expertise").)

26
27
28

**31**

**J.   Relevant Evidence Regarding the Accident Flight**[13]

On July 16, 2001, Mr. Brohmer attended a required pre-mission briefing that took approximately two hours to complete. (USASUF #142; USA Ex. Z, Bromsey Depo. at 72-73; USA Ex. T, AFI 11-2F-16, Vol. 3 (1 July 1999), ¶2.5.)[14]  The briefing was conducted jointly by Lockheed's Andrew Bromsey and Air Force Major James Less.  Major Less began the briefing by covering the items in the standard briefing guide, including but not limited to, mission timing, flight line-up, takeoff, join up, recovery and landing, emergency procedures, Notices to Airmen (NOTAMs), and a host of special topics.  (Ex. Z, Bromsey Depo. at 76-77; ex. U, 416th Flight Test Squadron Briefing Checklist.)  Mr. Bromsey was responsible for discussing safety issues.  Mr. Bromsey "provided the aircrew with details concerning the test to

---

[13]      The United States also points to evidence related to this briefing that appears to concern the disclosure to Brohmer of the various risks associated with this flight.  (See USASUF # 148-151; 158-163.)  Plaintiff properly objects that these facts are irrelevant to the issue of employment.

[14]    The United States appears to point to the occurrence of this briefing as further evidence Brohmer's status as a "crewmember," exemplifying the fact that aerial photographers must attend pre- and post-flight briefings, during which the test pilot can assign to the photographer various briefing duties, including gathering weather information.  (USASUF #68; USA Ex. RR, Thornton Decl. at ¶4.)

Plaintiffs point out, however, that Brohmer was not assigned any such briefing duties, as these were handled by Less and Bromsey. (Less Depo. at 224:20-228:14; 232:9-21; Bromsey Depo. at 76:16-77:24; 78:9-19; 208:22-209:13).  Bromsey testified that Brohmer participated in the briefing to add his "vast photo experience."  (Bromsey Depo. at 72:19-73:15.)

1  be conducted and the expectations and requirements of the  test

2  team." (USASUF #146; USA Ex. Z, Bromsey Depo. at 153-54.)

3      During the briefing, Mr. Bromsey expressed his interest in

4  obtaining as much videotape of the MALD as possible, including

5  its separation from the drop aircraft, flight, chute deployment,

6  descent, and impact.  Mr. Bromsey indicated that the MALD had

7  been failing at a very high rate and the video would be helpful

8  in analyzing the failures.  (USASUF #147; USA Ex. Z, Bromsey

9  Depo. at 128-30.)

10      As the pilot in command of the photo/safety chase aircraft,

11  Major George was ultimately responsible for deciding how he would

12  fly the photo/safety chase aircraft and where he would position

13  the aircraft relative to the MALD to permit Mr. Brohmer to

14  videotape it.  (USASUF #152; Ex. Y, Reynolds Depo. at 70-71.)

15  Major Less testified that, "[t]he big concern for this mission

16  was keeping track of the MALD, so it did not go off reserve – or

17  withheld land, whatever the terminology is." (USASUF #154; Ex.

18  DD, Less Depo. at 212.)  The primary objective of the "occupants"

19  of the chase aircraft was "to monitor and keep track of the MALD

20  so that if it was heading out of the reserved airspace, the

21  control room could be alerted, and they [the control room] could

22  terminate it and prevent it from damaging or injuring people or

23  things on the ground." (USASUF #155; Ex. DD, Less Depo. at 212-

24  13; *see also* Ex. RR, Thornton Depo. at 608-09.)  "The secondary

25  objective for them - the chase aircraft was to get video of the

26  launch and the flight of the MALD." (USASUF #156; Ex. DD, Less

27  Depo. at 213.)  Less also testified, however, there were people

28  on the ground who could track the MALD without input from

**33**

1   aircraft and destroy the MALD and render it harmless from the

2   ground if necessary.  (Less Depo. at 213:13-214:1)

3       A working camera was not listed on the mission's "go/no-go

4   criteria."  (In other words, the absence of a working camera

5   would not have forced the abandonment of the mission.)  Go/no-go

6   requirements that were listed on the flight test card include

7   MALD ground checks,  telemetry, flight termination system beacon,

8   MALD flight track and one ground tracking radar.  (USASUF #157;

9   USA Ex. RR, Thornton Depo. at 607, 672; ex. II, Flight Test

10  Card.)

11

12      **K.   Discipline of Mr. Bromsey**.

13      In an apparent attempt to provide another example of the

14  assertion of control by the Air Force over a Lockheed employee,

15  the Air Force explains that Mr. Bromsey was forced to go through

16  re-training after the accident, because the Combined Test Force

17  felt he did not brief the flight crew as well as he could have.

18  (USASUF #164; USA Ex. RR, Thornton Depo. at 631-33.)

19      Bromsey operated both as a Lockheed employee and a

20  representative of the Air Force.  Mr. Bromsey explained this in

21  his deposition:

22          Q:    Even though you're a Lockheed-Martin
                  employee,...you're the Air Force's
23                representative?

24          A:    That's right....We wear many hats.

25          Q:    So what you're saying is you basically had two
                  jobs at the time; one working for the Air Force
26                and one working for Lockheed?

27          A:    That's correct.

28  (Ex. Z, Bromsey Depo. at 132-33.)

The Air Force asserts that without retraining, Bromsey would not have been able to return to his job as  test conductor. Bromsey was required to become "re-certified," and had to walk through two missions with senior conductors.   Bromsey was permitted back as a test conductor only after obtaining specific permission from Colonel Thornton.  (USASUF #166 Ex. RR, Thornton Depo. at 631-33.)

The defendant has admitted, however, that Mr. Bromsey **was not its "employee."**  (*See* Pltfs' Ex. 8, Requests for Admission 8.5E.27, 8.5E.28.)

### L.    Worker's Compensation Arrangement at the time of the Accident.

The contract between Lockheed and the Air Force required Lockheed to secure and maintain workmen's compensation and employers liability insurance.  The requirement for doing so was specified in Special Contract Requirements Clause H-109 and Federal Acquisition Regulation Clause 52.228-5, which was incorporated into the Contract.  Clause H-109 states:

> [T]he Contractor shall, at its own  expense, procure and thereafter maintain the following kinds of insurance with respect to performance under the contract.
>
> a.    Workmen's Compensation and Employers Liability Insurance as required by law . . . .

(USASUF #27; USA Ex. F, Contract.)

Federal Acquisition Regulation Clause 52.228-7, which was also incorporated into the contract, similarly required Lockheed Martin to provide and maintain workers' compensation and employer's liability insurance.  It further provided that

1  Lockheed Martin would be reimbursed by the United States for that

2  portion of the reasonable cost of insurance allocable to the

3  contract.  (USASUF #28; USA Ex. F, Contract.)

4       Lockheed Martin secured workers' compensation from the

5  California Department of Industrial Relations and maintained a

6  certificate of insurance effective at the time of the accident.

7  (USASUF #29; USA Ex. H, Certificate of Consent to Self-Insure.)

8       Before Mr. Brohmer began working for In the Light, the two

9  companies discussed who would pay for his workers' compensation

10 insurance.  In The Light initially maintained that Lockheed

11 Martin should pay for the policy, but after further negotiation,

12 In The Light eventually purchased a policy with the intent that

13 it would cover Mr. Brohmer.  In the Light informed Mr. Brohmer of

14 the existence of the policy.  (USASUF #168; USA Ex. X, Kamper

15 Depo. at 110-48, 177.)  After the accident, In The Light filed a

16 workers' compensation claim on Mr. Brohmer's behalf, but the

17 claim was denied.  Among other reasons, In The Light's policy did

18 not cover California citizens, and the insurer found that Mr.

19 Brohmer was not In The Light's employee under Texas law.  (USASUF

20 169; USA Ex. X, Kamper Depo. at 211.)

21

22       **M.   Plaintiffs' Efforts to Obtain Payment on Any Workers'
             Compensation Policy.**

23

24       Plaintiffs never received any payments on any workers

25 compensation policy.  (A. Brohmer Decl. at ¶¶ 16-17.) However, it

26 is not clear from the record whether Plaintiffs ever sought such

27 payments from any of the potential employers in this case.

28 Apparently, In the Light filed a claim on Brohmer's behalf, which

**36**

1  was denied.  (USASUF 169; USA Ex. X, Kamper Depo. at 211.)  It

2  appears that no other claims were filed.  The record is silent as

3  to whether Brohmer sued In the Light or Lockheed for alleged

4  failure to secure and maintain workers compensation insurance.

5

6  ### III.  __STANDARD OF REVIEW__

7      Summary judgment is warranted only "if the pleadings,

8  depositions, answers to interrogatories, and admissions on file,

9  together with the affidavits, if any, show that there is no

10 genuine issue as to any material fact."  Fed. R. Civ. Pro. 56(c);

11 *California v. Campbell*, 138 F.3d 772, 780 (9th Cir. 1998).

12 Therefore, to defeat a motion for summary judgment, the non-

13 moving party must show (1) that a genuine factual issue exists

14 and (2) that this factual issue is material.  *Id.*  A genuine

15 issue of fact exists when the non-moving party produces evidence

16 on which a reasonable trier of fact could find in its favor

17 viewing the record as a whole in light of the evidentiary burden

18 the law places on that party.  *See Triton Energy Corp. v. Square*

19 *D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995); *see also Anderson v.*

20 *Liberty Lobby, Inc.*, 477 U.S. 242, 252-56 (1986).  Facts are

21 "material" if they "might affect the outcome of the suit under

22 the governing law."  *Campbell*, 138 F.3d at 782 (quoting *Anderson*,

23 477 U.S. at 248).

24     The nonmoving party cannot simply rest on its allegations

25 without any significant probative evidence tending to support the

26 complaint.  *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir.

27 2001).

28

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrell*, 477 U.S. 317, 322-23 (1986).  The more implausible the claim or defense asserted by the nonmoving party, the more persuasive its evidence must be to avoid summary judgment.  *See United States ex rel. Anderson v. N. Telecom, Inc.*, 52 F.3d 810, 815 (9th Cir. 1996).  Nevertheless, the evidence must be viewed in a light most favorable to the nonmoving party.  *Anderson*, 477 U.S. at 255.  A court's role on summary judgment is not to weigh evidence or resolve issues; rather, it is to determine whether there is a genuine issue for trial.  *See Abdul-Jabbar v. G.M. Corp.*, 85 F.3d 407, 410 (9th Cir. 1996).

## IV.  <u>ANALYSIS</u>

### A.  <u>Evidentiary Disputes</u>.

As a threshold matter, the United States objects generally that many of the declarations offered by Plaintiffs should be disregarded because they are not based upon personal knowledge, as is required by Federal Rule of Civil Procedure 56.[15]

---

[15]    Fed. R. Civ. Pro. 56 provides: "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show

**38**

1    The United States first protests generally that many of

2  Plaintiffs' declarants conclude that Mr. Brohmer was an

3  "independent contractor."  The United States properly points out

4  that this is a legal conclusion and the declarants' opinion in

5  this regard should be disregarded.  This does not mean, however,

6  that any factual assertions made within these declarations are

7  necessarily improper.  For example, if based upon personal

8  knowledge, a declarant might properly state that Mr. Brohmer

9  signed an "independent contractor" agreement with In the Light.

10 This factual assertion does not necessarily require the legal

11 conclusion that Mr. Brohmer was an independent contractor, but

12 may be relevant to the inquiry.  The United States also objects

13 that many such factual assertions made by Plaintiffs' declarants

14 are actually not based upon personal knowledge.  These specific

15 objections are addressed in turn.

16         **1.       Objections Regarding Paul Smith's Declaration.**

17    The United States objects to Paul Smith's statements that

18 Mr. Brohmer was an "independent contractor," because, when

19 questioned at his deposition, Mr. Smith admitted that he had no

20 personal factual knowledge to support this assertion.  In fact,

21 he stated that he thought Brohmer was an independent contractor

22 because Plaintiffs' attorney told him so.

23         Q.      Did Judson have a contract with the U.S.
                   Government?
24
         A.      I don't have any direct knowledge of that.
25

26  _____

27 affirmatively that the affiant is competent to testify to the
   matters stated therein."
28

```
1    Q.    Do you have any knowledge as to what the terms
           of his employment was?
2
     A.    No.
3
     Q.    This was what [Plaintiffs' attorney] Ned Good
4          told you?

5    A.    Yes.

6    Q.    So whether or not what Ned Good told you true
           or not, you have no personal knowledge?
7
     A.    Correct.
8
     Q.    You just assumed that it was because he told
9          you it was; true?

10   A.    Yes. That, and based upon the relationship he
           described Judson had with the Government at
11         that time.

12   Q.    What did he say was the relationship?

13   A.    That he was an independent contractor, that he
           was in a position that was - that's noted there
14         [in the declaration].
```

15  (Ex. AAA, Smith Depo. at 144-45.)

16      As discussed above, Smith also retracted other portions of

17  his declaration after being presented with additional evidence at

18  his deposition.  For example, he retracted his assertion that the

19  training Mr. Brohmer received was the same training that any

20  passenger or visiting dignitary would receive. (Ex. AAA, Smith

21  Depo. at 141, 157-59.)  He also admitted, contrary to assertions

22  made in his declaration, that Brohmer's designation as a

23  "crewmember" is an "artificial designation."

```
24   A:    ....A passenger has literally no duties; a crew
           member has some duties.
25
     Q.    It's not a meaningless designation; correct?
26
     A.    Correct.
27
     Q.    If somebody were to say it was meaningless, you
28         would dispute that; correct?
```

**40**

1          A.      Yes.

2          Q.      It's not an artificial designation; correct?

3          A.      That is correct.

4    (Ex. AAA, Smith Depo. at 181.)

5          The United States points to additional retractions by Smith,

6    including the admission made at his deposition that Brohmer did

7    not have complete freedom to work whenever he wanted, because the

8    Air Force needed to create the mission, and then Mr. Brohmer

9    needed to be current under Air Force rules. (Ex. AAA, Smith Depo.

10   at 143.)

11         But, the United States overreaches with its assertion that

12   these retractions eviscerate the value of Smith's entire

13   declaration.  Plaintiffs correctly point out that other portions

14   of Smith's declaration are based upon personal knowledge and have

15   not been retracted.  For example, Smith stated that:

16             Judson Brohmer always exercised his independent
               judgment and skills as a photographer while I used my
17             independent judgment and skill to safely fly the plane
               as the sole pilot in command...[w]hat Judson Brohmer
18             did was to generally tell me about the photography he
               wanted to take and that he would be sighting the
19             objects or objects he was to photograph and tell me the
               position he wanted me to fly the plane so he could do
20             his job of getting good pictures or videos.

21   (Smith Decl. at ¶5, as cited by Plaintiffs in Doc. 147-1 at 2.)

22         The United States also overreaches with its assertion that:

23             Mr. Smith's testimony alone provides sufficient
               evidence to grant summary judgment in favor of the
24             United States, as it proves that the Air Force had the
               right to control Mr. Brohmer's work on the MALD mission
25             on the day of the accident. Mr. Smith's testimony
               further shows that the Air Force's control over Mr.
26             Brohmer extended beyond the day of the accident, and
               that the Air Force required Mr. Brohmer to attend
27             training sessions, fly in missions where he didn't
               photograph anything, maintain flight currency, and

28

**41**

attend safety briefings. These requirements were not made of passengers or visiting dignitaries.

(Doc. 143, 18-19.)  As is discussed below, the summary judgment standard demands a more searching inquiry into the entire record, and whether the record reveals evidence that might allow the trier of fact to conclude that Brohmer was not a special employee of the United States.

## 2.    Objections Regarding Philip Arno's Declaration.

The United States raises similar objections to statements made by Philip Arno in his deposition.  For example, Arno declared that Brohmer was only selected to be on the F-16 because of his unique skills as a photographer.  (*See* Arno Decl. at ¶9.) But, when asked "who informed you of that," Arno responded "Mr. Ned Good," Plaintiffs' prior counsel.  The United States points to numerous other examples of statements made by Arno in his declaration that are not supported by personal knowledge.  (Doc. 143 at 19-20.)

Plaintiff does not respond to the specific objections raised by the United States, but does point to at least one example of a factual assertion made by Arno that remains undisputed and unchallenged.  Arno stated that:

Performing the duties of an aerial photographer requires sustained and substantial concentration and focus....The photographer must use all of his special skills and judgment and full attention to frame the object and to sight the object through his camera veiewfinder....

(Arno Decl. at ¶10.)  The United States concedes that Arno was an aerial photographer, but asserts that his job situation (as a TV news helicopter photographer) was far different from Brohmer's

1  role in Air Force flight testing.  For example, the government

2  notes that Arno was not considered an air crewmember, had no

3  special training, and was subject to no pre-flight restrictions.

4  These distinctions, however, go to the weight and relevance of

5  Arno's assertions, not to their admissibility.  To the extent

6  that facts asserted by Mr. Arno are based upon personal

7  knowledge, they are addressed.

8

9          **3.       Objections Regarding Sean Roberts' Declaration.**

10      The government makes the same objections to the Declaration

11  of Sean Roberts, the Director of the National Test Pilot School.

12  As discussed, to the extent that Mr. Roberts advances legal

13  conclusions, those conclusions will be given no weight.  Roberts

14  suggested in his declaration that the training Mr. Brohmer

15  received from the Air Force was similar to training any passenger

16  might receive and was not indicative of Brohmer's employment

17  status.  The latter suggestion is a legal conclusion, and Roberts

18  also retracted its substance during his deposition.  Certain

19  aspects of Roberts' declaration are based upon first hand

20  knowledge.  For example, Roberts stated that "Airborne

21  photographers have a unique talent of being able to withstand the

22  maneuvers of a fighter aircraft [while] capturing excellent

23  images of other aircraft in flight."  (Roberts Decl. at ¶10.)

24  Again, to the extent that his declaration is based upon personal

25  knowledge, it is admissible evidence.  To the extent that the

26  United States has demonstrated otherwise, such evidence will not

27  be considered.

28

**43**

1          **4.       Objections to Charles Killberg's Declaration.**

2       The United States appears to raise only a narrow objection

3   with respect to Killberg's assertions that Brohmer was an

4   "independent contractor."  As this is a legal conclusion,

5   Killberg's view of the law is not credited.  However, Plaintiffs

6   point out (and the United States impliedly concedes by citing

7   other portions of Killberg's declaration and testimony in support

8   of its motion[16]) that the bulk of evidence presented through

9   Killberg is unobjectionable.

10

11         **5.       Objections to Don Llorente's Declaration.**

12      Finally, the United States objects to the declaration of

13  Don Llorente, who has been hired as an expert witness for

14  Plaintiffs.  The United States notes that Mr. Llorente reviewed

15  only a select number of documents provided to him by Plaintiffs'

16

17      [16]    Again, the United States asserts in the context of its
18  evidentiary objections that:

19          Mr. Killberg's testimony provides ample evidence of the
            Air Force's right to control Mr. Brohmer's job duties.
20          Mr. Killberg testified extensively about the training
            that the Air Force provided to Mr. Brohmer. Mr.
21          Killberg also testified about Mr. Brohmer's job duties
            as a crewmember. (Ex. DDD, Killberg Dep. at 21-23,
22          46-50, 144- 47, 152.) Mr. Killberg flew with Judson
            Brohmer 31 times. He estimated that about a third of
23          those flights were proficiency flights, in which Mr.
            Brohmer would not be photographing anything, or would
24          be photographing objects for practice. (Ex. DDD,
            Killberg Dep. at 68-73; Accord Ex. AAA, Smith Dep. at
25          149.)
26

27  (Doc. 143 at 22.)  As discussed, the summary judgment standard
    does not permit judgment to turn on the testimony of one witness
28  where other evidence proves contradictory.

**44**

1  counsel.  More specifically, the United States asserts that Mr.

2  Llorente, who apparently has a background in accident

3  investigation, testified incorrectly about a number of key,

4  undisputed facts in this case, such as who owned the camera,

5  whether Mr. Brohmer needed to maintain currency to fly on Air

6  Force missions, and whether the camera was a go/no-go item on the

7  flight test card. (USA Ex. EEE, Llorente Depo. at 41-42, 67,

8  125-27.)  Llorente actually admitted that he had no knowledge of

9  Mr. Brohmer's job responsibilities:

10          Q.      And do you know whether or not Mr. Brohmer's
                    duties and responsibilities as an aerial
11                  photographer onboard military aircraft changed
                    in any way as a result of his [leaving]
12                  full-time employment with Lockheed Martin?
            A.      I have no knowledge of any of Mr. Brohmer's
13                  duties and responsibilities, other than that he
                    has done these missions before. I have no
14                  intrinsic knowledge whatsoever of his
                    background with regard to his flying in
15                  military aircraft.

16  (USA Ex. EEE, Llorente Depo. at 94.)  Despite this admission, Mr.

17  Llorente maintains that Mr. Brohmer was not a "crewmember."

18  Plaintiff offers no response to this objection.  The United

19  States has established that Llorente's assertions with respect to

20  Brohmer's crewmember status are not supported by personal

21  knowledge and therefore are inadmissible.

22

23          **B.    Applicable Legal Framework**.

24          This lawsuit, brought by Judson Brohmer's wife and three

25  minor children under the Federal Tort Claims Act ("FTCA"), 28

26  U.S.C. §§ 1346(b), 2671-80, alleges that Mr. Brohmer's death was

27  due to the negligence of Major George.  The United States, while

28  not conceding tort liability, admits that Major George failed to

**45**

1  maintain "situational awareness" and that this failure caused the

2  crash.  However, the United States asserts that it cannot be held

3  liable in tort, because Plaintiffs' sole remedy lies in

4  California's worker's compensation law.

5       The FTCA creates a private right of action in federal court

6  for tort claims against the United States "under circumstances

7  where the United States would be liable to the [plaintiff] in

8  accordance with the law of the place where the [allegedly

9  tortious] act or omission occurred."  28 U.S.C. § 1346(b).  It is

10 undisputed that California law governs the relationship between

11 the parties in this case, as all relevant conduct took place

12 within California.[17]

13      Under California's worker's compensation system, employers

14 are required to secure workers compensation insurance for their

15 employees.  In turn, employees are compensated for injuries

16 sustained during the course of employment under a highly

17 regulated workers' compensation insurance system.  An important

18 facet of the system is that an injured employee may not bring a

19 tort suit directly against his or her employer.  An employee's

20 remedies are limited to the benefits provided under the worker's

21 compensation laws.  Cal. Lab. Code § 3602(a).  In this way,

22 California's worker's compensation system "represents a balance

23 between the advantage to the employer fo immunity from liability

24 at law and the advantage to the employee of swift and certain

25

26      [17]    In the Light, with which Brohmer signed an independent
27 contractor's agreement, is located in Texas, but no party
   suggests that Texas' workers compensation law should govern the
28 relationship between Brohmer and the United States.

compensation." *Jones v. Kaiser Indus. Corp.*, 43 Cal. 3d 552, 562 (1987).

The law draws a distinction, however, between "employees," for whom the employer must secure workers compensation coverage, and "independent contractors," for whom an employer is not directly responsible under the system. The term employee is broadly defined to include "every person in the service of an employer under any appointment or contract or apprenticeship, express or implied, oral or written, whether lawfully or unlawfully," Cal. Lab. Code § 3351, while an independent contractor is "any person who renders services for a specified recompense for a specified result, under the control of his principal as to the result of his work only and not as to the means by which such result is accomplished," Cal. Lab. Code § 3353.

In addition to the statutory division between "employees" and "independent contractors," the California courts also apply the agency concept of "special employment" to the workers' compensation system. According to a line of cases, an employee may be deemed to have two or more employers for purposes of the worker's compensation system.

> The possibility of dual employment is well recognized in the case law. Where an employer sends an employee to do work for another person, and both have the right to exercise certain powers of control over the employee, that employee may be held to have two employers - his original or "general" employer and a second, the "special" employer.... If general and special employment exist, the injured workman can look to both employers for workers' compensation benefits. If workmen's compensation is available, it constitutes, with an exception not pertinent here, the workman's sole remedy against the employer. Thus where there is

**47**

> dual employment the workman is barred from maintaining an action for damages against either employer.

*Kowalski v. Shell Oil Co.*, 23 Cal.3d 168, 174-75 (1979)(internal citations and quotations omitted); *see also Miller v. Long Beach Oil Devel. Co.*, 167 Cal. App. 2d 546, 549 (1959).  California courts have applied this dual employment doctrine to labor brokerage situations, barring an  "employee who is injured while on assignment from a labor broker...from bringing a tort suit against the assigned employer."  *Riley v. Southwest Marine Inc.*, 203 Cal. App. 3d 1242, 1251 (1987); *see also Wedeck v. Unocal Corp.*, 59 Cal. App. 4th 848 (1997); *Johnson v. Berkofsky-Barret Prod. Inc.*, 211 Cal. App. 3d 1067 (1989); *Santa Cruz Poultry Inc. v. Super. Ct.*, 194 Cal. App. 3d 575 (1987).

In this case, the United States asserts that Judson Brohmer was a "special employee" of the Air Force at the time of his death, while Plaintiff maintains that Brohmer does not qualify as a "special employee" and should, instead, be deemed an "independent contractor."  If Brohmer qualifies as a special employee, he may not pursue the instant tort claim against the federal government.  If, on the other hand, Brohmer was operating at the time of the accident as an independent contractor for purposes of California's worker's compensation law, his tort claim may proceed.

### C. <u>Does the General Liberal Construction Rule Apply, or Does a "More Exacting" Standard Apply</u>?

The parties do not agree on the standard that a court should use in determining whether a particular individual is a "special employee."  On the one hand, the worker's compensation statute is

**48**

1   to be "liberally construed by the courts with the purpose of

2   extending their benefits for the protection of persons injured in

3   the course of their employment."  Cal. Lab. Code § 3202.  For

4   example, a job applicant who was injured while participating in a

5   "tryout" for a city refuse worker position was deemed a special

6   employee of the city, because the applicant was "undertaking a

7   special risk of employment" at the time of the injury.  *Laeng v.*

8   *Workmen's Comp. Appeals Bd.*, 6 Cal. 3d 771, 783 (1988).

9   Similarly, in *Arriaga v. Alameda*, 9 Cal. 4th 1055 (1995), on

10  which the United States heavily relies, an individual injured

11  while performing community service in lieu of paying a speeding

12  ticket was deemed an employee, rather than a volunteer, for

13  purposes of the workers' compensation statute.  *See also Waggener*

14  *v. Los Angeles*, 39 Cal. App. 4th 1078 (1995)(juror injured while

15  performing service deemed county employee); *Truesdale v. Workers'*

16  *Comp. App. Bd.*, 190 Cal. App. 3d 608 (1987)(finding cosmetologist

17  to be employee of salon, even though the customer exercises

18  control over work).

19      Plaintiffs acknowledge that many cases liberally construe

20  the scope of special employment, but insist that in most (if not

21  all) of these cases, the employee was seeking coverage through

22  the compensation system and the employer was attempting to

23  disavow the employee-employer relationship.  Plaintiffs maintain,

24  however, that courts impose a "more exacting" standard of proof

25  for the existence of an employment relationship where "such a

26  relationship is asserted as a defense by [an] employer to a

27  common law action."  *See Spradlin v. Cox*, 201 Cal. App. 3d 799,

28

**49**

807-08 (1988)(*citing Laeng v. Workmen's Comp. Appeals Bd.*, 6 Cal. 3d. 771, 779 n.8 (1988).

In support of the application of this "more exacting" standard in tort cases brought by injured workers, Plaintiffs rely principally upon *Laeng*.  In that case, the California Supreme Court was reviewing a determination by the Worker's Compensation Appeals Board that a job applicant who was injured while participating in a "tryout" for a city refuse position was not entitled to workers' compensation benefits.  The *Laeng* court reversed the Board's decision, deeming the applicant a "special employee" of the city, in part because the applicant was "undertaking the special risks of employment" at the time of the injury.  Plaintiffs highlight footnote eight from *Laeng*, which addressed *Sumner v. Edmunds,* 130 Cal. App. 770, 777-778 (1933), a negligence suit against the owner of the newspaper delivery car in which the plaintiff was riding as a passenger to learn the route in the event a job opening should arise in the future. *Laeng* distinguished *Sumner* in part because *the Sumner* decision reflected "the marked tendency...of many courts to be more exacting in requiring proof of an employment relationship when the relationship is urged by the employer as a defense to a common law action...."  *Laeng*, 6 Cal. 3d. at 799 n.8.[18]

But, the California Supreme Court has spoken more plainly on the issue in *Arriaga*, 9 Cal. 4th at 1055, a case decided <u>after</u>

_____

[18]   The United States attempts to minimize the import of *Laeng's* footnote eight by suggesting that *Laeng* mentioned the "more exacting" standard in the context of criticizing, rather than endorsing, a case in which such a standard was applied. (*See* USA Repl. at 13.)

*Laeng*.  In *Arriaga*, an individual, injured while performing community service in lieu of paying a speeding ticket, brought a negligence lawsuit against the County of Alameda.  Applying the liberal construction doctrine, the court determined (1) that *Arriaga* was a covered "employee," rather than a non-covered volunteer, for purposes of the workers' compensation statute, and (2) that her negligence lawsuit must therefore be dismissed, because worker's compensation constituted her sole remedy.  In so holding, the *Arriaga* court reasoned:

> Our conclusion comports with the Legislature's command in section 3202 that the Act be liberally construed by the courts with the purpose of extending its benefits for the protection of persons injured in the course of their employment.  This command governs all aspects of workers' compensation; it applies to factual as well as statutory construction. [Citations] Thus, if a provision in The Act may be reasonably construed to provide coverage or payments, that construction should usually be adopted even if another reasonable construction is possible. [Citations] **The rule of liberal construction is not altered because a plaintiff believes that she can establish negligence on the part of her employer and brings a civil suit for damages. It requires that we liberally construe the Act in favor of awarding workers' compensation, not in permitting civil litigation.** [Citations] *[S]ee also Machado v. Hulsman* [119 Cal. App.3d 453, 455-456 (1981)] [Act must **"be liberally construed in favor of the application of ... benefits [citations] even where it might be to the advantage of a particular plaintiff to avoid them and seek a remedy at law"**].)

9 Cal. 4th at 1065 (internal citations and quotations omitted)(emphasis added).  *See also Mason v. Lake Dolores Group, LLC*, 117 Cal. App. 4th 822, 834 (2004); *Wright v. Beverly Fabrics, Inc.*, 95 Cal. App. 4th 346, 353-54 (2002); *Tucci v. Club Mediterranee, S.A.*, 89 Cal. App. 4th 180, 193-93 (2001).

Plaintiffs offer no authority to rebut the holding in *Arriaga*.  The Workers' Compensation Act must be liberally

construed in favor of finding the existence of an employment
relationship, whether the issue of employment is brought as a
defense to workers compensation liability or as a defense in a
civil suit for damages.

### D.   **Special Employment Factors**.

Regardless of the rule of construction ("liberal" or "more
exacting"), the parties appear to agree that California courts
have articulated a number of factors which are relevant to the
existence of a special employment relationship.  In *Kowalski*, 23
Cal. 3d at 176-78, which concerned tort claims brought by an
individual hired to perform maintenance work on defendant's
property, the California Supreme court considered a number of
factors to be relevant in assessing whether a special employment
relationship existed between the injured party and defendant,
including:

> (1)   "Evidence that the alleged special employer has the
>       power to discharge a worker."
>
> (2)   "The payment of wages,"
>
> (3)   "[T]he nature of the services, whether skilled or
>       unskilled,"
>
> (4)   "[W]hether the work is part of the employer's regular
>       business,"
>
> (5)   "[T]he duration of the employment period,
>
> (6)   "[W]ho supplies the work tools,"
>
> (7)   Who retains "the right to control the details of the
>       work" performed,

**52**

1    (8)  "[W]hether the worker consented to the employment

2         relationship, either expressly or impliedly," and

3    (9)  "[W]hether the parties believed they were creating the

4         employer-employee relationship."

5  (*Id.* at 177-78.)

6       No one factor is treated as dispositive.  In *Arriaga*, three

7  factors supported the court's finding of a special employment

8  relationship.  Specifically, at the time of the injury,

9  (1) *Arriaga* was in the service of the defendants and defendant

10 benefitted from her work; (2) she was under the control of the

11 defendants, who had the power to assign her to a job and to

12 perform particular tasks; and (3) the work to which she was

13 assigned "exposed her to the same risks of employment that other

14 transportation workers faced."  *Arriaga,* 9 Cal. 4th at 1062-63.

15 On the other hand, certain evidence "tend[s] to negate the

16 existence of special employment," including evidence that:

17          The employee is (1) not paid by and cannot be
            discharged by the borrower, (2) a skilled worker with
18          substantial control over operational details, (3) not
            engaged in the borrower's usual business, (4) employed
19          for only a brief period of time, and (5) using tools
            and equipment furnished by the lending employer.
20
   *Marsh v. Tilley Steel Co.*, 26 Cal. 3d. 486, 492-93 (1980).
21
22      In addition to analyzing the above-mentioned factors in

23 order to determine whether a "special employment" relationship

   existed here, the parties also urge a parallel analysis of the
24
   facts to determine whether Brohmer was an "independent
25
   contractor" as that term is defined by statute and caselaw.  For
26
   example, the United States cites *Johnson v. Workmen's Comp. App.*
27
   *Bd.*, 190 Cal. App. 3d 318 (1974) and *Truesdale v. Workers' Comp.*

28 *App. Bd.*, 190 Cal. App. 3d 608, 614 (1987), both of which applied

**53**

various factors to analyze whether a particular individual was
operating as an "independent contractor." (*See* Doc. 79, at 14-
15.)   But, the factors applied in *Johnson* and *Truesdale* (e.g.,
whether the employee works without supervision, performs the work
for a specified amount rather than an hourly rate, operates as
part of an independent business, furnishes specialized equipment
and skills, and performs work not normally a part of the regular
business of the principal), although worded somwhat differently,
are essentially the same as those applied in *Kowalski* to
determine the existence of a "special employment" relationship.
In other words, an analysis of the various factors set forth in
*Kowalski* will enable a court to determine **both** whether an
individual is a "special employee" and whether they are covered
by the statutory definition of "independent contractor."   In
fact, the parties briefs cite the same facts in support of
arguments under both frameworks.   Wherever reasonable, such
repetition is avoided below.

### E.   Application of the Legal Framework in the Summary Judgment Context.

Ordinarily, a defendant in a civil action "who claims to be
one of that class of persons protected from an action at law by
the provisions of the [Worker's Compensation] Act bears the
burden of pleading and proving, as an affirmative defense to the
action, the existence of the conditions of compensation set forth
in the statute which are necessary to its application." *Arriaga,*
9 Cal. 4th at 1060.

There are some (narrow) circumstances in which it would be
appropriate to dismiss a claim or issue judgment before trial.

For example, "when a complaint affirmatively alleges facts indicating that the [Worker's Compensation] Act applies," the complaint is subject to dismissal "unless it states additional facts that negate application of the exclusive remedy rule." *Arriaga,* 9 Cal. 4th at 1060.  Alternatively, it might be appropriate to decide the special employment issue on summary judgment if the relevant facts are essentially undisputed.  *See Marsh*, 26 Cal.3d at 493.

However, the California Supreme Court has reiterated on more than one occasion that, "where the evidence, though not in conflict, permits conflicting inferences, the existence or nonexistence of the special employment relationship barring the injured employee's action at law is generally a question reserved for the trier of fact."  *Id.* at 493; *Kowalski*, 23 Cal. 3d at 175; *see also Miller*, 167 Cal. App. 2d at 550.  For example, the *Marsh* court reversed a lower court's dismissal of a tort claim because the evidence permitted a contrary finding regarding the existence of a special employment relationship.  *Marsh*, 26 Cal. 3d at 493-95.[19]

The summary judgment standard in a special employment case is expressed as follows:  if the undisputed evidence together with the disputed evidence viewed in a light most favorable to

---

[19]     The only federal case cited extensively by either party, *Cockrell v. United States*, 86 F. Supp. 2d 994, 1005-06 (S.D. Cal. 1999), further cautions against deciding special employment issues on summary judgment.  *Cockrell* was decided after a bench trial that focused exclusively on the issue of special employment.  Only after hearing all of the evidence from both sides, did the district court in *Cockrell* find that the parties did not intend to create a special employment relationship.

Plaintiff permits conflicting inferences with respect to the existence of a special employment relationship, summary judgment must be denied.  Where the evidence can only point to one inference, summary judgment is appropriate.

The United States correctly notes, however, that the <u>court</u> is the ultimate trier of fact in a FTCA suit.  *See* 28 U.S.C. § 2402.  Under such circumstances, the United States asserts that summary judgment standard is modified:

> The law of this Circuit provides that "where the ultimate fact in dispute is destined for decision by the court rather than by a jury, there is no reason why the court and the parties should go through the motions of a trial if the court will eventually end up deciding on the same record." *Transworld Airlines, Inc. v American Coupon Exch., Inc.*, 913 F.2d 676, 684 (9th Cir. 1990).

(Doc. 143 at 2.)  Defendant quotes only a portion of the *Transworld* standard.  Further guidance is gleaned from the complete passage:

> Not every novel claim or complex case must be settled through trial, and we must not let the difficulty of such cases make us hostile to summary adjudication generally.  Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action.

> Moreover, where the ultimate fact in dispute is destined for decision by the court rather than by a jury, there is no reason why the court and the parties should go through the motions of a trial if the court will eventually end up deciding on the same record. **However, just as the procedural shortcut must not be disfavored, courts must not rush to dispose summarily of cases-especially novel, complex, or otherwise difficult cases of public importance-unless it is clear that more complete factual development could not possibly alter the outcome and that the credibility of the witnesses' statements or testimony is not at issue. Even when the expense of further proceedings is great and the moving party's case seems to the court quite likely to succeed, speculation about the facts must not**

**take the place of investigation, proof, and direct observation.**

In this case, almost no evidence supported the district court's conclusion that TWA's restrictions on the alienability of its travel award coupons are reasonable. The evidence that was before the district court completely failed to illuminate many areas of inquiry so important that the court thought it necessary to speculate about them. The evidence presented in this case did not warrant entry of summary judgment.

*Transworld Airlines, Inc. v American Coupon Exch., Inc.*, 913 F.2d 676, 684-85 (9th Cir. 1990)(internal quotations and citations omitted)(emphasis added).

The Ninth Circuit addressed this holding in a footnote in *Chevron USA, Inc. v. Cayetano*, 224 F.3d 1030, 1038 (9th Cir. 2000), a case in which the district court would have been the trier of fact.  The *Chevron* court cautioned against the grant of summary judgment on an undeveloped factual record:

Because this case will be tried to the court, rather than a jury, the question arises whether it was improper for the district court to engage in fact-finding, since it will eventually be called upon to perform that very task. This court has held that if the parties agree that all of the underlying material facts are reflected in the written record, a judge may decide factual issues and essentially convert cross-motions for summary judgment into submission of the case for trial on the written record. *See Starsky v. Williams*, 512 F.2d 109, 111 (9th Cir. 1975). The court noted, however, that result was justified by the unique circumstances of that case. *See id*. Moreover, the court later cautioned that such fact-finding is not appropriate on an undeveloped factual record. *See TransWorld* [Citation and quotation from *TransWorld* omitted.]

**Although the parties in this case submitted a Stipulation of Facts, there is no clear indication, as there was in Starsky, that all of the relevant facts are contained in the written record**. In fact, in the Stipulation itself, the parties clearly reserve the right to rely on other statements. Therefore, we hold that the district court erred in resolving factual disputes at this stage, even though it must do so later.

57

*Id*. at 1038 n.6.

Accordingly, under *Transworld and Chevron*, although a court that will ultimately act as the trier of fact may weigh evidence in deciding a summary judgment motion, it should not do so if more complete factual development could alter the outcome or if the credibility of witness statements or testimony at issue.

**F.**   **Analysis of the "Special Employment" Factors**.

**1.**   **The United States' objections to reliance on *Cockrell v. United States*.**

Plaintiffs cite extensively to a district court case, *Cockrell v. United States*, 101 F. Supp. 2d 1291, 1295 (S.D. Cal. 1999), based on factual parallels between it and this case. *Cockrell* concerned several pilots employed by a private company, Aero Union, who were killed in a mid-air collision while landing their fire-fighting tanker aircraft.   The collision occurred while their aircraft was returning from fire suppression activities alongside United States Forest Service aircraft and personnel in Southern California.   The Aero Union plane operated under a contract between Aero Union and the Forest Service to provide the government with air tanker support during firefighting.

The *Cockrell* opinion was written after a bench trial on the issue of "special employment" and contains numerous findings of fact and conclusions of law.   The United States objects generally to reliance upon *Cockrell*, arguing that it misapplies California workers compensation law.   For example, as discussed above, *Cockrell* applies the "more exacting standard" to its determination of employment status, rather than the "liberal"

1  standard articulated by the California Supreme Court in *Arriaga,*

2  9 Cal. 4th 1065.  In addition, the *Cockrell* court cited "intent"

3  as a "key factor" under special employment law, but cited no

4  cases to support this finding.  While "consent" is a valid factor

5  under California law and consent may be implied from the facts

6  and circumstances, "intent" is not articulated in any California

7  cases as a factor to be considered in the employment relationship

8  determination.  *Cockrell* is only marginally persuasive from a

9  legal standpoint.  While there are factual parallels between

10 *Cockrell* and the instant case, there are also numerous

11 distinctions to be drawn.  What *Cockrell* does confirm is the

12 general principle that the special employment determination is a

13 fact-intensive analysis.

14

15            **2.      Right to Control.**

16      The United States places considerable emphasis on the

17 control factor, asserting that the employer's "right to control

18 and direct the activities of the alleged employee or the manner

19 and method in which the work is performed, whether exercised or

20 not," that is the "primary consideration."  *Kowalski*, 23 Cal. 3d

21 at 175.  California courts have suggested that it is the "right

22 of control" is more important than the "exercise of control."

23 *Wedeck*, 59 Cal. App. 4th at 859 (the "absence of exercise of

24 control has seldom been given any weight in showing absence of

25 right of control, since the non-exercise can often be explained

26 by lack of occasion for supervision of the particular employee,

27 because of his competence or experience.").  It is undisputed

28 that the right of control need not be exclusively vested in one

**59**

employer. "[A] general and special employment relationship is present if there exists in each some power, not necessarily complete, of direction and control." *McFarland v. Voorheis-Trindle Co.*, 52 Cal. 2d 698, 704 (1959).

Here, the United States asserts that undisputed facts in this case support a finding that the Air Force had the right to direct and control Brohmer's work:

> The undisputed facts of this case demonstrate that the Air Force had the right to direct and control the manner and method of Mr. Brohmer's work on the military test flight. This was a military mission, and the videotaping of the decoy test was a part of the regular business of the Air Force. The Air Force set the date, time, place, and all other specific details of the mission, including the type of camera to use.  The Air Force trained Mr. Brohmer as a crewmember, maintained his training and flight records, scheduled him for the mission, and gave him his equipment, including the Sony camcorder. The Air Force required Mr. Brohmer to attend a two-hour mission briefing the day before the flight, to obtain proper crew rest, and to refrain from drinking alcohol. An Air Force pilot was in command of the flight, and determined where the aircraft would be positioned. The Air Force released the decoy that Mr. Brohmer was videotaping. As previously noted, Mr. Brohmer received specific instructions to film the test from start to finish. The Air Force pilot had the right to terminate the mission at any time or to order Mr. Brohmer to stop videotaping, monitor the MALD's position, assist with see and avoid duties, assist with the emergency checklist, call out altitudes, or in certain circumstances, pilot the aircraft. In other words, Mr. Brohmer was subject to the orders of the Air Force pilot while on board the aircraft. Mr. Brohmer had no rights to any photographs or video footage he took on the mission.

(Doc. 79, at 13-14.)

As a threshold matter, United States combines within its argument regarding the "control" factor a number of other factors, including the "regular business" factor, and the "provision of tools and equipment" factor as though they were

synonymous with the issue of "control."[20]   Those other factors
are separately analyzed.

A close examination of the record reveals that there are
competing inferences with respect to the exercise of control.

• **Assertion by the United States**: "The Air Force set the date,
   time, place, and all other specific details of the mission,
   including the type of camera to use."

Discussion:  Plaintiffs present evidence indicating that
Brohmer did not work regularly or permanently on the MALD program
while with In the Light.  This was a one-time assignment.  There
was no requirement that Brohmer be available at particular times
or for particular periods of time.  Nor was there any indication
that he could be required to accept particular missions or
disciplined for failing to accept an assignment.  The United
States points out in response that he could have been excluded
for repeated failure to participate in flights, because this
would have affected whether he retained certain training
currencies.  This indicates the existence of a competing
inference and the factor is disputed.

//

//

//

//

---

[20]   Specifically, the United States asserts as support for
its exercise of "control" that (1) "[t]his was a military
mission, and the videotaping of the decoy test was a part of the
regular business of the Air Force;" and (2) "[t]he Air Force gave
[Brohmer] his equipment, including the Sony camcorder."

**61**

1    •    **Assertion by the United States**: The Air Force "trained Mr.

2         Brohmer as a crewmember," and "maintained his training and

3         flight records."

4         Discussion:   The United States has gone to great lengths to

5    establish that Brohmer was treated as a "crewmember" and trained

6    to behave as one.   Plaintiffs, however, point to a large body of

7    evidence suggesting that one's designation as a "crewmember" may

8    not have any relevance to one's employment status.   For example,

9    Plaintiffs cite numerous depositions of other aerial

10   photographers who considered themselves to be "crewmembers" but

11   not "employees" of the United States.   Of course, one's

12   employment status is a legal determination that must be based

13   upon the factors set forth in California law.   But, the United

14   States has done little to establish how "crewmember" status fits

15   into the legal framework (i.e., they have not effectively

16   explained the legal significance of this evidence).   For example,

17   the United States cites *Kowalski*, 23 Cal. 3d at 175, for the

18   proposition that "[t]he primary consideration is whether the

19   special employer has the right to control and direct the

20   activities of the alleged employee or the manner and method in

21   which the work is performed, whether exercised or not."   But,

22   even assuming Brohmer is a "crewmember," the extent to which this

23   status impacts the United States' ability to control his work is

24   contested.   It is undisputed that the United States can require

25   Brohmer to stop his photographic work and behave as a crewmember

26   at any time during a flight, but, does this transform him into a

27   special employee of the government?

28

Plaintiffs cite several cases concerning general agency principles that are instructive.  For example, in *Linstead v. Chesapeake & O. Ry. Co.*, 276 U.S. 28, 34 (1928), the United States Supreme Court distinguished between "authoritative direction and control, and mere suggestion as to details or the necessary cooperation, where the work furnished is part of a larger undertaking."  A similar distinction was drawn by the California Supreme Court:

> It is true that many authorities specify "control" of the person performing work as the means of differentiating service from independent employment. The test of "control," however, means "complete control." For example, the citizen who hires a taxicab to take him to a certain place exercises that amount of control over the driver, but he does not thereby become the man's employer.  It is well settled that, where one person is performing work in which another is beneficially interested, the latter may exercise over the former a certain measure of control for a definite and restricted purpose, without incurring the responsibilities, or acquiring the immunities, of a master, with respect to the person controlled.

> ***

> It has been said that the true test of a contractor is that he renders service in the course of an independent occupation, following his employer's desires in the results, but not in the means used, <u>but in weighing the control exercised we must carefully distinguish between authoritative control and mere suggestion as to detail or the necessary co-operation where the work furnished is part of a larger undertaking</u>.

*Western. Indem. Co. v. Pillsbury*, 172 Cal. 807, 811 (1916).

• **Assertion by the United States**: The Air Force required Mr. Brohmer to attend a two-hour mission briefing the day before the flight, to obtain proper crew rest, and to refrain from drinking alcohol.

    Discussion:  The United States' strongest evidence of "control" is the undisputed fact that Brohmer had to abide by Air

**63**

Force rules and standards for ground behavior in order to maintain his flight status.[21]  However, the California Supreme court has suggested that the mere application of rules of conduct to an individual does not transform the individual into an employee.

> If rules are made only for the general control of
> conduct of a person while on the premises of another,
> mere conformity to such rules does not indicate or
> establish that the persons involved are employees of
> the person making the rules.

*Manchester Ave. Co. v. Stewart*, 50 Cal. 2d 307, 313-14 (1958)
It is not possible from the record to determine whether the rules imposed upon Brohmer's conduct by the Air Force were merely "for the general control of conduct of a person while on the premises of another" or whether they went further, to control the nature of his work as an aerial photographer.

//
//
//
//

---

[21]    The only case cited by the parties that discusses a similar control issue is *Cockrell*.  101 F. Supp. 2d 1291. *Cockrell* noted that the Forest Service had little or no control over the decedent pilots' activities either on the ground or while airborne.  In fact, those pilots were not even required to obey the direction of the Forest Service lead plane pilot while participating in fire-fighting activities.  In part as a result of this absence of control, in addition to other factors, the *Cockrell* court concluded that the Aero Union pilots were <u>not</u> special employees of the United States.  But, *Cockrell* is distinguishable from this case, where it is undisputed that Brohmer was required to abide by Air Force ground and in-flight restrictions in order to participate in the MALD missions. Moreover, the objections raised by the United States cast serious doubt on *Cockrell*'s legal analysis.

1 • **Assertion by the United States**: An Air Force pilot was in

2 command of the flight, determined where the aircraft would

3 be positioned, and released the decoy that Mr. Brohmer was

4 videotaping.

5 Discussion: These facts are undisputed.  But, whether they

6 are material to the inquiry is not clear.  As the United States

7 asserts, "the primary consideration is whether the special

8 employer has the right to control and direct the activities of

9 the alleged employee or the manner and method in which the work

10 is performed, whether exercised or not." *Kowalski*, 23 Cal. 3d at

11 175.  But, while the Air Forces' control over the chase aircraft

12 and the MALD itself might impact the success of Brohmer's work,

13 does it equate to an constitute of <u>control</u> over Brohmer's work?

14

15 • **Assertion by the United States**: Mr. Brohmer received

16 specific instructions from Air Force Personnel to film the

17 test from start to finish.

18 Discussion: Although this particular fact is undisputed, it

19 is of doubtful import.  An independent contractor is defined as

20 "any person who renders services for a specified recompense for a

21 specified result, under the control of his principal as to the

22 result of his work only and not as to the means by which such

23 result is accomplished."  Cal. Lab. Code § 3353.  Giving Brohmer

24 the instruction to film the entire MALD flight goes to the

25 desired result not the means by which the result is obtained.

26 //

27 //

28 //

**65**

1    •    **Assertion by the United States**: The Air Force pilot had the

2         right to terminate the mission at any time or to order Mr.

3         Brohmer to stop videotaping, monitor the MALD's position,

4         assist with see and avoid duties, assist with the emergency

5         checklist, call out altitudes, or in certain circumstances,

6         pilot the aircraft.

7    Discussion: These facts are essentially undisputed.

8    However, they do not demonstrate control over the means by which

9    Brohmer accomplished the task for which he was placed aboard the

10   aircraft in the first place: filming the MALD.  If the Air Force

11   instructed him to perform other duties, it is impliedly

12   instructing him to abandon the photography task.  The government

13   is essentially arguing that even if an individual performs one

14   task as an independent contractor, he can be made into a special

15   employee by requiring him to perform <u>other</u> tasks.  The government

16   cites no legal authority to support this proposition.

17

18   •    **Assertion by the United States**: Mr. Brohmer had no rights to

19        any photographs or video footage he took on the mission.

20   Discussion:  This fact is undisputed.  However, there is no

21   reason to conclude that this arrangement is inconsistent with a

22   conclusion that Brohmer was an independent contractor.  He need

23   not have gained proprietary rights in the result he was to

24   accomplish to retain independent contractor status

25   //

26   //

27   //

28   //

**66**

- **Counter-Assertion by Plaintiff**: Brohmer's relationship with the United States lacked the normal incidents of employment.

Discussion: Plaintiff cites *Cockrell*, 101 F. Supp. 2d at 1294-95, for the proposition that absence of normal incidents of employment, such as the provision of benefits or payment according to government pay grades, may be evidence of the absence of control. The district court in *Cockrell* compared the workforce management tasks undertaken by the government to those undertaken by a private contractor.  Alongside numerous other factors, the lack of control by the United States over workforce administration weighed against a finding of special employment:

> Overall, the Government only performed a fraction of the overall activities; whereas Aero Union [the contractor] performed virtually all of the activities necessary to recruit, train, and manage the workforce. The fraction of activity performed by the Government-the operational direction and deployment exercised by the Government-does not rise to the level of the right to control the details of the required work to warrant a finding of special employment. While the Government bargained for the operational deployment of the tankers under the Contract, it was also simultaneously agreed to by the Parties that Aero Union would have exclusive control over the hiring, training, promoting, disciplining, firing, <u>compensating (including required deductions for all taxes and other assessments, and accounting for all benefits provided, e.g., health insurance insuring for liability and workers' compensation</u>, accounting for each employee (e.g., assigning to a certain base and keeping track of hours), outfitting, and supplying equipment for all persons acquired for the maintenance and flights of the tankers described in the Contract....

*Cockrell*, 86 F. Supp. 2d at 1294095 (emphasis added).

There are some flaws in the reasoning applied by the *Cockrell* court.  The very nature of a "special employee" is one that is "borrowed" from the general employer.  It is logical that the general employer would maintain responsibility for the

67

provision of benefits.  If retention of this responsibility by

the general employer weighs against a finding of special

employment, it is hard to imagine any situation where the special

employment doctrine would apply.


    In sum, there are competing inferences in the record

regarding the United States' "control" over Brohmer.  Although

there is considerable evidence indicating that the United States

controlled the non-photographic aspects of Brohmer's presence on

the airplane, there is contrary evidence regarding the

government's lack of control over the performance of his

photographic work.

### 3.    Consent to an Employment Relationship.

    Whether an employee consents, either expressly or impliedly,

to the creation of an employment relationship is another critical

element.  *See Kowalski*, 23 Cal. 3d at 178 ("consideration must be

given to whether the worker consented to the employment

relationship, either expressly or impliedly....").  In a

footnote, the *Kowalski* court cited Larson's treatise on Workmen's

Compensation Law for the following proposition:

> If the question [of the existence of consent] cannot be
> answered 'yes,' the investigation is closed, and there
> is no need to go on into the tests of relative control
> and the like. This must necessarily be so, since the
> employee loses certain rights along with those he gains
> when he strikes up a new employment relation. Most
> important of all, he loses the right to sue the special
> employer at common law for negligence; and when the
> question has been presented in this form, the courts
> have usually been vigilant in insisting upon a showing
> of a deliberate and informed consent by the employee
> before employment relation will be held a bar to
> common-law suit.

*Id.* at 178 n.10 (citing Larson, Workmen's Compensation Law, §
48.10, at 8-205-8-206.)

The United States argues that Brohmer consented to a special
employment relationship with the United States by "submitting to
the Air Force's control and direction":

> To fly on Air Force aircraft as an aerial photographer,
> Mr. Brohmer was required to undergo training by the Air
> Force, maintain Air Force-prescribed currency
> requirements, take and pass weekly tests, read Flight
> Crew Information Files, and abide by Air
> Force-prescribed rules for its crewmembers. As
> evidenced by his flight and training records (which the
> Air Force maintained), Mr. Brohmer voluntarily
> submitted to these requirements so that he could
> continue to fly on board Air Force aircraft and
> maintain his government flight authorization (ex. J7,
> Form 81). With respect to the accident mission, Mr.
> Brohmer attended the required meetings, showed up at
> the time the Air Force told him to, and otherwise
> complied with the Air Force's directions. Mr. Brohmer's
> consent thus may be inferred.

(Doc. 79 at 16.)

However, Plaintiffs provide numerous examples of individual
Lockheed aerial photographers who maintain that they never
thought of themselves or Brohmer as "employees" of the
government.  Their conclusions are largely irrelevant to the
special employment legal determination, except to the extent that
the widespread understanding shared by many other photographers
militates against a finding that Brohmer implicitly consented to
an employment relationship with the Air Force.

The United States correctly points out that Plaintiffs
conflate this "consent" factor with an examination of the
parties' "intent."[22]  One can <u>consent implicitly</u> to a special

---

[22]   While arguing on the one hand that the intent of the
parties is not a relevant factor, the United States advances the

employment relationship, even though one does not <u>intend</u> to become a special employee. Instead of looking to the parties' <u>intent</u>, California courts tend to examine whether the employee submitted to the control of the employer in determining whether the employee impliedly consented to a special employment relationship. *See Martin v. Phillips Petrol Co.*, 42 Cal App. 3d 916 920 (1974)(employee's consent inferred from acceptance of control and direction, even though no contract expressly formed)(overruled on other grounds); *Santa Cruz Poultry Inc. v. Super. Ct of Santa Cruz*, 194 Cal. App. 3d 575, 583 (1987)(consent inferred even though employee did not intend to become a special employee); *Wedeck*, 59 Cal. App. 4th at 861 n.7 (1997)(same).[23]

More persuasively, however, Plaintiffs point to evidence suggesting that Brohmer made the shift from full time employment

---

contradictory argument that "[t]he contract under which Mr. Brohmer provided services to the Air Force shows that all parties intended the Air Force to control Mr. Brohmer's work." (*See* Doc. 79 at 16-17.) But, even if the intent of the parties was relevant to the issue of "special employment," a proposition that the United States itself refutes, Plaintiffs have presented evidence that raises a contradictory inference. For example, Colonel Mark Ward, who at the time of the accident was the Operations Officer for the 416th Flight Test Squadron, understood that Brohmer entered into his new contract with In the Light to obtain "more flexibility in his career...." (Ward Depo. at 44:7-16.)

    [23]    In support of the application of an "intent" factor, Plaintiff cites *Cockrell*, 86 F. Supp. 2d at 1006, where the district court, applying California Worker's Compensation law, cited the parties' intent as a "key factor" in the special employment analysis. But, the United States correctly points out that *Cockrell* did not cite any authority for finding intent to be a "key factor" and elsewhere appears to have departed from the substantive legal standards applied by California courts. As a result, *Cockrell's* reasoning in is largely unpersuasive.

1   with Lockheed <u>specifically to alter the extent to which his</u>

2   <u>schedule could be controlled by others</u>.  For example, Colonel

3   Mark Ward, who at the time of the accident was the Operations

4   Officer for the 416th Flight Test Squadron, understood that

5   Brohmer entered into his new contract with In the Light to obtain

6   "more flexibility in his career...."  (Ward Depo. at 44:7-16.)

7   In conjunction with the fact that Brohmer did indeed leave his

8   permanent position with Lockheed to enter into an "Independent

9   Contractor" agreement with In the Light.  At the very least, this

10  evidence raises a question as to whether Brohmer consented to a

11  "special employment" relationship and subjected himself to the

12  control of with the United States.

13                  **4.     Authority to Discharge.**

14       It appears to be undisputed that the Air Force did not have

15  the authority to "discharge" Brohmer from either Lockheed's

16  employ (while Brohmer was so employed) or to cancel Brohmer's

17  contract with In the Light.  However, it is also undisputed that

18  the Air Force did have authority to exclude him from

19  participation in Air Force missions on a number of grounds,

20  including failure to comply with Air Force regulations, failure

21  to stay current in his training and health qualifications, etc.

22       "Evidence that the alleged special employer has the power to

23  discharge a worker is strong evidence of the existence of a

24  special employment relationship."  *Kowalski*, 23 Cal. 3d at 177.

25  However, the fact that "an alleged special employer can have an

26  employee removed from the job site does not necessarily indicate

27  the existence of a special employment relationship."

28

**71**

> Anyone who has the employees of an independent contractor working on his premises could, if dissatisfied with an employee, have the employee removed. Yet, the ability to do so would not make the employees of the independent contractor the special employees of the party receiving the services.

*Id*. at 177 n.9; *accord Cockrell*, 101 F. Supp. 2d at 1295 n.3 (finding the right of the United States to exclude participation by employees of a contractor providing fire suppression flights to the Forest Service did not demonstrate that the government was a special employer of the air crew who died while landing their fire suppression tanker aircraft).

*Kowalski* also suggests that this factor is not to be given a great deal of weight, except that affirmative evidence that an employer has the power to terminate the employment relationship is strong evidence that a special employment relationship exists. Here, the evidence suggests that, although the United States had power to exclude Brohmer for failing to maintain his training currencies, the United States did not have the power to terminate him. Because *Kowalski* suggests that this factor be given little weight, however, the absence of such proof is not critical to the success of the United States' motion.

### 5.    Payment of Wages.

In this case, it is not disputed that Brohmer was paid by In the Light at the time of the accident. Although the payment of wages is mentioned as a factor, according to *Kowalski*, it is "not determinative." 23 Cal. 3d at 177. It is also undisputed that Brohmer was paid for the amount of time he spent on the job ($600/day), not for a specific end product, and that he would have been paid regardless of the outcome. These facts are not

72

wholly inconsistent with the definition of independent
contractor:  "<u>any person who renders services for a specified
recompense for a specified result</u>, under the control of his
principal as to the result of his work only and not as to the
means by which such result is accomplished."  Cal. Lab. Code
§ 3353 (emphasis added).

**6.      Provision of Tools and Equipment.**

"Evidence that...the employer provides the tools and
equipment used, tends to indicate the existence of special
employment.  Conversely, evidence to the contrary negates
existence of a special employment relationship."  *Kowalski*, 23
Cal. 3d. at 177.

There is no dispute that the Air Force supplied the
photo/safety chase aircraft and that the Air Force stored,
maintained, and inspected all life support equipment (*e.g.*,
helmets, G-suits, oxygen masks) used by Mr. Brohmer during the
flight.  (USASUF #132; USA Ex. W, Life Support Records; Ex. Y,
Reynolds Depo. at 116.)   In addition, at least some of the
photographic equipment used by Mr. Brohmer during the flight test
was supplied by the Air Force.  Tom Reynolds issued an Air Force
video camera to Mr. Brohmer to use during the mission.  (USASUF
#131; USA Ex. Y, Reynolds Dep. at 106.)   Two other still cameras
on the plane were owned by Judson Brohmer.  (A. Brohmer Decl. at
¶11; USASUF #134; Ex. RR, Thornton Depo. at 607-09, 672; Ex. II,
Flight Test Card.)   However, the United States maintains that his
mission was to take <u>video</u>.  (*Id.*)

Plaintiffs note that, although Brohmer was issued one flight
suit by <u>Lockheed</u> and one by the government (USASUF #133; USA Ex.

1  PP, Robertson Depo. at 254), at the time of the accident,

2  however, Brohmer was wearing the Lockheed flight suit (A. Brohmer

3  Decl. at ¶12).  Finally, Plaintiffs note that Brohmer brought

4  aboard black felt (which Brohmer owned) to reduce glare and

5  reflection in the cockpit.  (Robertson Depo. at 75:18-77:15;

6  79:21-80:22-82:23; 145:21-24.)  This factor favors Brohmer.

7                  **7.    Skilled v. Unskilled Labor.**

8       California courts have recognized that a worker is more

9  likely to be an "independent contractor" if his or her occupation

10 requires a particularized skill and/or the exercise of judgment

11 in its execution.  *See S.G. Borello & Sons*, 48 Cal. 3d 350, 351,

12 357 (1989)(citing 1C Larson, *Workmen's Compensation,* § 45.00, at

13 8-174 ("The modern tendency is to find employment when the work

14 being done is an integral part of the regular business of the

15 employer, and when the worker, relative to the employer, does not

16 furnish an independent business or professional service.")).  The

17 court in *Borello* noted that the task performed by the employees

18 in that case, sharecroppers, "involves simple manual labor which

19 can be performed in only one correct way...[and] can be learned

20 quickly. While the work requires stamina and patience, it

21 involves no peculiar skill beyond that expected of any employee."

22 *Borello*, 48 Cal. 3d at 357.

23      Here, in contrast, it appears to be essentially undisputed

24 that Brohmer did exercise a particularized skill as an aerial

25 photographer, that he had considerable experience and training

26 which enabled him to perform his "art," and that his work

27 demanded the exercise of expert judgment to be performed

28 correctly.  For example, Reynolds testified that the aerial

                                **74**

photography required in this case demands a high degree of skill and concentration in order to keep the MALD in camera sight.

The United States suggests that this factor is not particularly important, pointing to one California case, *Wedeck,* 59 Cal. App. 4th at 859, in which a highly skilled chemist was found to be a special employee of Unocal. However, the *Wedeck* court found that the record demonstrated that the chemist "was expected to exercise her technical skill in the way dictated by Unocal's systems and procedures." *Id*. The *Wedeck* court specifically distinguished *McFarland v. Voorheis-Trindle Co.*, 52 Cal. 2d 698, 704 (1959):

> In McFarland, the plaintiff, a master mechanic and experienced equipment operator, was employed by a tractor company and was operating a bulldozer at the defendant's jobsite when he was injured. (52 Cal.2d at p. 701.) "<u>No control was exercised by the defendant over the plaintiff in the performance of his duties as mechanic and repairman. Nor does it appear that the defendant instructed the plaintiff or other operators in the running of their equipment</u>. The defendant's superintendent, in assigning work, designated the job to be done, such as a road to be cut or brush to be cleared within surveyed lines, and the details of that work were left to the judgment of the individual equipment operators. It appears that the plaintiff was operating under such instructions when the accident occurred." (Id. at p. 705.) The Supreme Court concluded that the evidence on the question of control admitted of different inferences and therefore reversed the trial court's judgment notwithstanding the verdict that the plaintiff was the special employee of the defendant.

*Wedeck*, 59 Cal. App. 4th at 860.  The facts of this case are closer to *McFarland* than to *Wedeck*.  Here, although the Air Force did impose conditions and controls on Brohmer's participation in the flight program and on his presence in the aircraft, the Air Force exercised little or no control over the performance of Brohmer's photographic skills.

75

1    The United States also points to cases from other

2  jurisdictions in which photographers were found to be employees

3  notwithstanding their special skills:  *Brown v. Time.* Inc., 419

4  N.Y.S. 2d 297 (N.Y. App. Div. 1979) and *Carmody v. Woolworth Co.,*

5  361 S.E. 2d 128 (Va. 1987).[24]  *Brown* was an appeal from a

6  determination made by the N.Y. workers' compensation board.  The

7  board examined all of the evidence and, on balance, came to the

8  conclusion that this particular photographer was an employee

9  because:

10         While decedent had control over the mechanical aspects
           of the actual photography, the record in this case
11         clearly establishes that <u>Time-Life exercised
           substantial control and supervision over his over-all</u>
12         <u>photographic activities</u>; that he was paid on a per diem
           basis rather than on a per job basis; that Time-Life
13         furnished the decedent with equipment to use while on
           assignment; and that Time-Life had the right to fire
14         him if he disregarded its instructions.

15  *Brown*, 419 N.Y.S. 2d at 299.  The specific facts regarding

16  Brown's work are important:

17         Joseph Brown, a photographer, was assigned by appellant
           to photograph the White Mountains of New Hampshire as
18         illustrations for a book. During Brown's two week
           assignment, he could not work for other entities.
19         Travel arrangements were made for Brown through the
           Time, Inc. Travel Bureau.

20
           <u>A memorandum was prepared for Brown by the picture
21         editor for Time-Life regarding his assignment.</u> It
           contained departure and arrival times as well as
22         directions for Brown to meet a Time-Life geologist, who
           was assigned to work with him on location. <u>The
23         memorandum also contained a "shooting script", setting
           forth a "very detailed" description of where Brown
24         should travel as well as the types of geological</u>

25

26         [24]   Defendant also cites an unpublished California case
    holding the same, *Francis v. Carpenter*, 2002 WL 31082093, but
27  Plaintiff moves to strike this reference (Doc. 88), but it is not
    appropriate to cite unpublished opinions, even for their
28  reasoning.

1    formations he should photograph. Brown could not change
2    the directions of the script without first conferring
     with the editor.

3    Brown returned film to Time-Life's office where it was
4    reviewed and edited by the picture editor who had the
     final say regarding what pictures would be published.
5    While on location, Brown called in several times
     concerning what he had seen, what he had shot, what he
6    thought he could shoot and how he should proceed. He
     was given instructions regarding pictures he should
7    take under certain weather conditions. If Brown had
     refused to follow the script, the editor had the right
     to recommend his discharge.

8    *Id.* at 298.

9
10        Here, Colonel Thornton Testified that the test conductor

11   would sometimes instruct the photographer to use specific

12   settings and the project engineers would tell the photographer

13   what film speed to use. (USASUF ## 63 & 74.)  However, Plaintiff

14   presents evidence that suggests it was Northrup Grummond, the

15   contractor manufacturing the MALD, not the Air Force, who defined

16   the photographic requirements of the flight. (Shakelford Depo.

17   at 354, 367.)  Moreover, other photographers testified that the

18   aerial photographer uses his or her judgment and skill to

19   determine how and what specific techniques to use. (Reynolds

20   Depo. at 102-103, 196-197, 329; Robertson Depo. at 64-69.)  In

21   addition, one test pilot testified that he deferred to the

22   photographer on issues within their "expertise." (Buckley Depo.

23   at 143-144.)  The facts here do not fall squarely within the

24   reasoning of *Brown*.

25        *Carmody*, 361 S.E. 2d 128, is even less helpful to the United

26   States.  That case concerned a photographer who worked inside

27   Woolworth's department store.  On the day of his accident he was

28   in fact acting as a salesperson, not a photographer, a factor

**77**

that was very important to the *Carmody* court's determination that
he was a "part of Woolworth's trade, business or occupation." *Id*.
at 133.

In sum, there are also conflicting inferences with respect
to the skilled versus unskilled labor factor.  Defendant does not
suggest that this factor is overwhelmed by proof regarding the
other factors, nor did it submit any cases so holding.

**8.   Part of the Regular Business of the Air Force.**

The United States asserts that aerial photography during
test flights was a regular part of the Air Force's business.
Colonel Walker, Director of Flying Operations responsible for the
operations of all aircraft at Edwards Air Force Base, testified
that photo/safety chase missions are an integral part of Air
Force flight tests.  Walker explained, for example, that the Air
Force Test Pilot School provides photo/safety chase instruction
as a regular part of its curriculum, and numerous Air Force
publications address the subject of photo safety chase missions.
(USASUF #50; USA Ex. C, Walker Decl. at ¶9.)  Chief Test Pilot
Paul Metz also testified that photo documentation of flight tests
was a regular part of the business of the Flight Test Center at
Edwards AFB.  (USASUF #51; USA Ex. OO, Metz Depo. at 170.)
Aerial photographers participated in 23 of the 24 developmental
MALD flight tests at Edwards AFB.  (USASUF #52; USA Ex. JJ,
Corrected List of MALD Missions.)  Plaintiffs do not dispute
these assertions, but point out that the Air Force did not have
any photographers who did aerial photography or video work at
Edwards Air Force Base who were employees of the government.
(Walker Depo. at 318:9-25; 358:18-360:6; Shakelford Depo. at

**78**

272:25-273:10).  The United States does not dispute the absence
of Air Force photographers at Edwards AFB, but does present
evidence that the Air Force does employ military aerial
photographers at another Air Force Base.  (*See* Doc. 143, Reply,
at 25; USA Ex. YY.)  On the current record, this factor does not
weigh decidedly in either direction.

**9.   Length of Employment Relationship.**

Plaintiff asserts the length of Brohmer's relationship with
the Air Force was brief, intermittent, and non-exclusive.  This
appears to have been the case, at least while Brohmer was
performing under his contract with In the Light.  The United
States rejoins, however, that Brohmer's relationship with the Air
Force while a Lockheed employee was long standing and essentially
exclusive.  The United States provides no authority, however, to
explain how Brohmer's tenure while a Lockheed employee is
relevant to the inquiry.

**10.   Conclusion Re: The Special Employment Analysis.**

The record now before the court does not permit summary
judgment.  There is competing factual evidence presented with
respect to almost every relevant factor.  More importantly, there
are significant questions that remain unanswered.  In particular,
although the United States exercised some degree of control over
Brohmer's conduct both on the ground and inside the cockpit, the
extent to which the government controlled his photographic work
is less clear.  Further factual development on this issue and on
some of the other disputed issues will aid the analysis.
Defendant's motion for summary judgment must be **DENIED.**

**79**

**G.   The Issue of Whether the United States Secured Workers' Compensation for Brohmer**.

The United States asserts separately that it "satisfied its role under the [Workers'] compensation statute by securing workers' compensation for Brohmer."  (Doc. 79 at 21.)   Under California Law, a defendant employer may be subject to tort liability if the employer fails to abide by the coverage requirements under the worker's compensation statute.   California Labor Code Section 3700 provides that:

> Every employer...shall secure the payment of compensation in one or more of the following ways:
>
> (a) By being insured against liability to pay compensation by one or more insurers duly authorized to write compensation insurance in this state.
>
> (b) By securing from the Director of Industrial Relations a certificate of consent to self-insure either as an individual employer, or as one employer in a group of employers, which may be given upon furnishing proof satisfactory to the Director of Industrial Relations of ability to self-insure and to pay any compensation that may become due to his or her employees.

Alternatively, an employer may contract with another employer to ensure that compensation insurance is provided:

> For the purposes of this division, including Sections 3700 and 3706, an employer may secure the payment of compensation on employees provided to it by agreement by another employer by entering into a valid and enforceable agreement with that other employer under which the other employer agrees to obtain, and has, in fact, obtained workers' compensation coverage for those employees. In those cases, both employers shall be considered to have secured the payment of compensation within the meaning of this section and Sections 3700 and 3706 <u>if there is a valid and enforceable agreement between the employers to obtain that coverage, and that coverage, as specified in subdivision (a) or (b) of Section 3700, has been in fact obtained, and the coverage remains in effect for the duration of the employment</u> providing legally sufficient coverage to the employee or employees who form the subject matter of the coverage.

80

1   § 3602(d)(emphasis added).   "Employers who have complied with
2   this subdivision shall not be subject to civil, criminal, or
3   other penalties for failure to provide workers' compensation
4   coverage or tort liability in the event of employee injury, but
5   may, in the absence of compliance, be subject to all three."
6   § 3602.

7       The United States asserts that it complied with the
8   requirements of California's workers' compensation laws by
9   requiring Lockheed Martin to obtain workers' compensation for all
10  contract employees.   The United States acknowledges that Lockheed
11  may have violated its contractual obligations by passing the
12  responsibility for providing insurance on to In the Light, but
13  the United states asserts that "this is not the subject of this
14  litigation."  (Doc. 79 at 21.)   Alternatively, the United States
15  asserts that it is self-insured under 5 U.S.C. § 8101, et seq.

16      Plaintiffs rejoin that the United States is under a more
17  stringent obligation than merely entering into a contract to
18  secure compensation coverage, correctly pointing out that section
19  3602(d) requires not only that the employer enter into a "valid
20  and enforceable agreement" to obtain coverage, but also that the
21  coverage "has been in fact obtained, and the coverage remains in
22  effect for the duration of the employment."  Here, the contract
23  requires Lockheed to "at its own expense, procure and thereafter
24  maintain the following kinds of insurance with respect to
25  performance under the contract...(a) Workmen's Compensation and
26  Employers Liability Insurance as required by law."  (Requirements
27  Contract, Ex. 2 to Pltfs' Suppl. Opp'n, Doc. 141.)   More
28  importantly, however, if at the conclusion of this litigation it

**81**

1   is found that the United States was Mr. Brohmer's special

2   employer, the United States' will be responsible for providing

3   workers compensation coverage as a self insured party.[25]

4       Plaintiffs first assert that the language "as required by

5   law" does not cover Brohmer because the law expressly excluded

6   independent contractors.  This is an entirely circular argument

7   that begs the very question at issue in this lawsuit.  If Brohmer

8   is a "special employee" he is covered by this language and the

9   contractual obligation to secure insurance for him would bind

10  Lockheed to do so.

11      Plaintiffs then argue that the United States should be

12  estopped from claiming that it secured workers' compensation for

13  Brohmer because it failed to provide him with notice that any

14  compensation insurance existed.  But, the only case plaintiffs

15  cite in support of application of estoppel is *Reynolds v.*

16  *Workmen's Compensation Appeals Bd.*, 12 Cal. 3d 726 (1974), in

17  which an employer who failed to give the required notice to the

18  employee was estopped from raising the statute of limitations as

19  a "technical defense" to a workers' compensation action.  The

20  equities favored estoppel in *Reynolds* because the very notice the

21  employer failed to give would have informed the employee of the

22  existence of the statute of limitations.  This is very different

23  from the request Plaintiffs make here -- that the employer be

24

25

26

27      [25]   Whether the United States may have a separate claim for
indemnification against Lockheed or another party is a separate
28  question not before the court at this time.

**82**

1  estopped from raising "special employment" as a defense to tort

2  liability.[26]

3

_____

4       [26]   Alternatively, the United States argues that it may
take advantage of the "special employer defense" but should not
5  be held responsible for compliance with the California Labor
Code.
6

7            The United States is entitled to assert any legal
            defense that could be asserted by a similarly situated
8            private person under the applicable state's law. The
            Federal Tort Claims Act authorizes tort actions against
9            the United States "under circumstances where the United
            States, if a private person, would be liable to the
10           claimant in accordance with the law of the place where
            the act or omission occurred." 28 U.S.C. § 1346(b)(1);
11           *United States v. Olson*, 126 S. Ct. 510, 511 (U.S. 2005)
            (discussing "private person" standard and citing
12           analogies to similarly situated private persons).

13
            Thus, the United States is to be treated as if it were
14           a private party under state law. Of course, the United
            States is not a private party. This leads to
15           Plaintiffs' confusion: they complain that the United
            States did not comply with California's Labor Code, yet
16           the United States does not, and is not required to,
            comply with each of the 50 states' labor laws. U.S.
17           Const. Art. VI (supremacy clause); *Peak v. Small Bus.
            Admin.*, 660 F.2d 375, 378 n.6 (8th Cir. 1981) (noting
18           that there is no congressional action subjecting
            federal agencies to state workmen's compensation laws).
19           Rather, the United States has its own workers'
            compensation program, 5 U.S.C. § 8101, and has also
20           created other unique compensation programs, such as the
            Military Claims Act, or the statutes providing
21           compensation for victims of terrorist attacks. Thus,
            Plaintiffs' argument that the United States did not
22           comply with California's Labor Code is not an issue
            here. Once a tort lawsuit has been filed, the United
23           States is entitled to all the defenses that a private
            party would be able to assert, including the special
24           employer defense.

25
            While Plaintiffs argue this is a "have your cake and
26           eat it, too" situation, this is, indeed, the way
            Congress set up the Federal Tort Claims Act, and the
27

28

**83**

1    The United States has satisfied its obligations under

2  California's workers' compensation statute, either through its

3  contract with Lockheed or by virtue of its self insured status.

4  On this record, there is no support for a finding that the United

5  States should be estopped from asserting as much.

6

7

8    **H.    Plaintiffs argument that Brohmer Could not have been a**

9  **"special employee' of the government because he was not a "general employee" of any other company**.

10   Five pages of Plaintiffs' opposition brief are dedicated to

11 arguing that Brohmer Could not have been a "special employee' of

12 the government because he was not a "general employee" of any

13

14                 government's ability to assert such defenses supports

15                 the nation-wide policy of promoting no-fault
                 compensations schemes over fault-based ones.

16

17 (Doc. 143 at 27-28.)  The United States is correct that it need
   not comply with workers' compensation laws, but the authorities

18 cited provide absolutely no support for the proposition that,
   despite noncompliance, the United States may nonetheless claim

19 state law immunities provided only to those who do comply.  *Peak*

20 *v. Small Bus. Admin.*, 660 F.2d 375 (8th Cir. 1981), the only case
   cited by the United States in support of this proposition, stands

21 for a very different principle.  Mr. Peak was an independent
   contractor injured on an Air Force base in Nebraska while working

22 under a federal agency contract.  The Nebraska courts issued an
   award in favor of Peak and against the federal agency under

23 Nebraska's workers' compensation system.  Peak then sought to
   enforce the judgment in federal court.  The Eighth Circuit

24 reasoned that the Federal Tort Claims act provided Peak's sole
   remedy against an agency of the United States.  While explaining

25 the exclusivity of the FTCA, the *Peak* court noted that the United
   States is not required to comply with state workers' compensation

26 statutes.  Nothing in *Peak* supports the extension suggested by

27 the United States.

28

other company.  (*See* Doc. 85 at 35-39.)  Plaintiffs asserts that the special employment doctrine only applies when a general employer has loaned a genuine employee to another entity.  Here, Plaintiffs maintain, Brohmer signed a contract with In the Light specifically designating himself as an "independent contractor." Therefore, In the Light could not have been Brohmer's "general employer" and, as a result, In the Light could not assign him as a "special employee" to the United States.  Although this argument is not illogical, it is unsupported by any direct citation to legal authority.  No cases have adopted this argument or even noted this potential problem.[27]

## V.   CONCLUSION

     For the reasons set forth above, Defendant's motion for summary judgment is **DENIED** on the issue of special employment; but **GRANTED** as to the United States' compliance with the statutory requirement that it obtain workers compensation insurance for Mr. Brohmer, as it asserts, if there is coverage, it is self-insured in compliance with California law.

IT IS SO ORDERED.

**Dated:    November 13, 2006**          _____/s/ Oliver W. Wanger_____
b2e55c                                UNITED STATES DISTRICT JUDGE

---

     [27]    The United States does not directly respond to Plaintiffs' argument.  Instead, the government reiterates its argument that Brohmer does not qualify as an "independent contractor" for purposes of California worker's compensation law.